UNITED STATES of America, Appellee,

v.

**Jairo Andres CASTRO and Oscar Ramiro Pozo, Defendants-Appellants.**

Nos. 235, 247, Dockets 86–1127, 86–1153.

United States Court of Appeals,
Second Circuit.

Argued Oct. 7, 1986.

Decided March 9, 1987.

David N. Lawrence, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Bruce A. Green, Asst. U.S. Atty., New York City, of counsel), for appellee.

Barry Bassis, The Legal Aid Soc., Federal Defender Services Unit, New York City, for defendant-appellant Jairo Andres Castro.

Jill Elijah, New York City, for defendant-appellant Oscar Ramiro Pozo.

Before LUMBARD, CARDAMONE and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

These are appeals from judgments of conviction entered against appellants in the United States District Court for the Southern District of New York following a jury trial before Chief Judge Charles L. Brieant. The indictment charged both appellants with conspiracy to manufacture and possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 (1982) and with the substantive crime of manufacturing and possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (1982 & Supp. III 1985). Castro also was charged with assaulting a federal officer in violation of 18 U.S.C. §§ 111, 1114 (1982). The jury returned verdicts of guilty as to each defendant. We affirm.

## BACKGROUND

Evidence at trial indicated that in June 1985, appellant Pozo and one "Mr. Safi" arranged to lease a farm for Safi in Callicoon Center, Sullivan County, New York. The farm, located two or three hours by car from New York City, comprised about sixty-two acres of land, a two-story farmhouse, and a detached barn and garage. The farm apparently had no livestock or crops, and was located in the woods three-tenths of a mile from the nearest road.

In August 1985, agents of the Drug Enforcement Administration ("DEA") learned of a shipment of ether and acetone from Miami to Brooklyn. These substances commonly are used in the processing and refinement of cocaine. The DEA commenced surveillance of a trucking firm in Brooklyn to which the shipment was to be delivered. Upon arrival, the shipment was accepted by a person who produced a driver's license bearing the name Miguel Acosta. Acosta loaded the drums onto a truck and drove it to the farm in Callicoon Center. For about ten days commencing August 14, 1985, DEA agents and New York State police surveilled the farm around the clock.

On August 16th, a gray car with three occupants arrived at the farm and two unidentified men alighted and removed the chemicals from the truck. The third occupant of the gray car departed in the car, followed ten minutes later by the other two men, who drove the truck.

That same day, several surveilling officers smelled ether fumes in the vicinity of the farm. During the next few days, several unidentified persons arrived and left the farm; the smell of ether remained. On August 22, 1985, Pozo arrived at the farm in the gray car.

From the record, it is unclear as to when Castro arrived, but it appears from an airplane ticket which he possessed at the time of his arrest that he arrived in New York City from Miami at about 7:00 p.m. on August 22nd. The next day, Castro and Pozo were observed conversing behind the farmhouse with an unidentified third individual. Castro also was observed that day on a tractor mowing the grass. The ether odor remained overnight and into the morning of August 24.

On August 24, 1985, the surveilling DEA agents and state police, having obtained a search warrant, entered the premises and commenced a search of the farm and the buildings. Agents testified that the search was commenced in a highly visible fashion and that they gave clear notice that they were law enforcement officers by, for example, wearing badges and police jackets and shouting "police." At this time, one state trooper noticed that the odor of ether was especially strong near the farmhouse and barn.

When the search commenced, Castro, who had been raking in front of the barn,

fled. DEA Agent Hunt testified that he pursued him, and that upon reaching him Castro struck him several times.

Castro was subdued and brought back to the farmhouse. At the farmhouse, Officer Figueroa, a New York State Trooper, interrogated Castro and told him there was reason to believe the premises were being used as a cocaine laboratory and informed him in Spanish of his constitutional rights. According to Figueroa, when asked "what [was] going on," Castro replied, "I don't know what you're talking about." However, when asked by Figueroa where drugs were kept, Castro pointed to a black shopping bag on the floor in the living room. A search of the bag revealed about 600 grams of 89% pure cocaine. In the bag, beneath the cocaine, a credit card receipt was found which bore Castro's imprinted and signed name. Also found in the shopping bag, on top of the cocaine, were several items of clothing. When it became necessary later for Castro to change his clothing, an agent started for the bedroom to get him a change of clothes from one of the dressers, whereupon Castro indicated that such clothing did not belong to him; he then pointed to the pile of clothing in the living room which had been removed from the black shopping bag. Castro changed into a pair of underwear from that pile and an agent noticed that the underwear fit him.

Figueroa's report indicated that Castro claimed that the cocaine belonged to "Acosta," who Castro later identified as being appellant Pozo.

A search of the unlocked portions of the barn revealed, *inter alia*, drums of ether, acetone and methyl ethyl ketone; approximately two kilograms of cocaine; and assorted other equipment necessary for the laboratory processing of cocaine, including chemical filters, respirators, heat-drying guns, triple-beam scales, laboratory glassware, and fans. Additional chemicals and equipment were stored in a locked area of the barn, although the agents apparently found that Castro and Pozo did not have keys for that area. A DEA chemist testified as to the uses of these chemicals and this equipment in a cocaine laboratory.

Pozo testified in his own defense; Castro did not. Pozo's testimony centered around his assertion that he was merely a caretaker at the farm hired by a third person to cut the grass and watch over the place. The defendants called no other witnesses.

The jury found the defendants guilty of all charges. Castro was sentenced to fifteen years imprisonment on each of the two narcotics convictions to run concurrently, and to one year imprisonment to be served consecutively on the conviction for assaulting a federal officer. Pozo was sentenced to twenty years imprisonment on each of the narcotics convictions to run concurrently. Appellants presently are serving their sentences.

On appeal, Castro principally argues (1) that a redaction of his post-arrest statement to Officer Figueroa violated the rule of completeness as embodied in Fed.R.Evid. 106; (2) that the evidence was insufficient to establish his guilt as to the narcotics charges; and (3) that several errors in the charge to the jury require reversal. Pozo claims that joinder of the assault charge against Castro with the narcotics charges against Pozo was improper and also that his sentence is excessive.

## DISCUSSION

One of the principal issues raised by Castro relates to an undisputed act and statement by Castro as described in Officer Figueroa's post-arrest report—the report itself was not received in evidence. In short, during the raid Figueroa asked Castro where the cocaine was kept. Castro pointed to a black plastic bag on the living room floor and stated that it was at the bottom of the bag. When Figueroa asked Castro how he knew the cocaine was in the bag, Castro replied that the bag belonged to Acosta, who had put it there.[1] Later, Castro identified Pozo as Acosta.

---

1. Agent Figueroa's report stated, in pertinent part,

... [An agent asked] MR CASTRO if he knew where the drug was being kept. MR CASTRO

Pozo, concerned about the portion of Castro's statement that implicated him, moved for a severance, citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (district court must sever where one defendant's out-of-court confession to be offered against that defendant contains statements inculpating co-defendant). The government offered to redact the evidence so that it was limited to Castro's act and statement directing Figueroa to the plastic bag. Castro objected, arguing that to allow admission of only the redacted evidence would violate the rule of completeness as embodied in Fed.R.Evid. 106. Castro claimed that omission of the part which attributed ownership of the cocaine to Acosta would make Castro's act of pointing and his statement appear to be a pure admission of ownership of the cocaine by himself. Castro moved for a severance, suggesting that this was the only way in which the evidence could be admitted without a redaction and that a mere redaction would render it misleading. The court denied the motion, and ruled that no part of the statement with respect to "Acosta" could be elicited from any witness. When Castro renewed the objection at trial, the court again rejected his argument, but suggested during colloquy with counsel that the essence of the exculpatory part of Castro's statement to Figueroa could be elicited:

> THE COURT: I suppose [Officer Figueroa] could be asked in cross-examination. I have been thinking about how you could accommodate to the ruling or get around it.
>
> "Did he say it was his cocaine?"
>
> "No, he didn't say it was his cocaine."

Tr. 213.

> THE COURT: ... I have already suggested that you or the government could ask [Figueroa], "Did he tell you it was

his," and he says no. "Did he say it was his cocaine?" "No he did not."

Tr. 296.

As a result, at trial Officer Figueroa testified during direct and cross-examination as follows:

[DIRECT EXAMINATION by the Government]

Q Did Mr. Castro tell you if the white powdered substance was his?

A In substance, he denied it, sir.

Tr. 303.

[CROSS–EXAMINATION by Castro's counsel]

Q Without telling me what he said, you then asked him how he knew the cocaine was in the bag. Don't tell me what he said. You then asked him how he knew the cocaine was in the bag, isn't that correct?

[Objection by Pozo's counsel.]

THE COURT: ... The fact is that he never said it was his cocaine, is that correct?

THE WITNESS: In substance, that's what he stated sir.

Tr. 339–40.

In sum, Castro suggests that the admission of the above testimony violated the rule of completeness as embodied in Fed.R. Evid. 106 since the judge allowed admission into evidence of the inculpatory part of Castro's act and statement (i.e., Castro knew where the cocaine was), but not the exculpatory part (i.e., Acosta (Pozo) put the cocaine in the bag).

Fed.R.Evid. 106 provides:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Under this rule, the omitted portion of a statement must be placed in evidence if

---

then pointed to a small black plastic bag sitting on the living room floor and stated that it was at the bottom of the bag under assorted clothing. [He asked] MR CASTRO how he come [sic] to know that there was cocaine in that particular plastic bag. MR CASTRO re-

sponded by saying that this plastic bag belong[ed] to MR ACOSTA which he (MR ACOSTA) had place[d] there while waiting for someone to come and pick him up and take him back to New York City.

necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion. *United States v. Marin,* 669 F.2d 73, 84 (2d Cir.1982); *United States v. Rubin,* 609 F.2d 51, 63 (2d Cir.1979), *aff'd,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *United States v. Capaldo,* 402 F.2d 821, 824 (2d Cir.1968), *cert. denied,* 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969); Fed.R.Evid. 106 advisory committee note.

■ As the government points out, Rule 106 governs only writings, *see United States v. Terry,* 702 F.2d 299, 314 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 106[01], at 106–4 (1986 ed.), since in practice verbal precision cannot be expected when the source of evidence as to an utterance is the memory of a witness. *See generally* 7 Wigmore on Evidence § 2097, at 608–11 (Chadbourn rev. ed. 1978). However, courts historically have required a party offering testimony as to an utterance to present fairly the "substance or effect" and context of the statement. In other words, while verbal precision may be unnecessary, the testimony "should at least represent the tenor of the utterance as a whole, and not mere fragments of it." *Id.* § 2099, at 618.

Moreover, Fed.R.Evid. 611(a)[2] empowers and obligates the district court to take account of these considerations. As stated by the advisory committee note, Rule 611(a) "restates in broad terms the power and obligation of the judge as developed under common law principles." Fed.R. Evid. 611 advisory committee note; *see also* 1 J. Weinstein & M. Berger, *supra* (compared to Rule 106, Rule 611(a) "provides equivalent control over testimonial proof"). Accordingly, whether we operate under Rule 106's embodiment of the rule of completeness, or under the more general provision of Rule 611(a), we remain guided by the overarching principle that it is the trial court's responsibility to exercise common sense and a sense of fairness to protect the rights of the parties while remaining ever mindful of the court's obligation to protect the interest of society in the "ascertainment of the truth." Fed.R.Evid. 611(a).

In light of these principles, in reviewing a district court determination such as the one at issue herein, we must limit ourselves to inquiring whether the district judge's actions amounted to an abuse of discretion. *See United States v. Weisman,* 624 F.2d 1118, 1128–29 (2d Cir.) (construing Rule 106), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). No doubt, the meaning of Castro's conduct and statement was changed somewhat by not allowing the jury to know that Castro had stated that the cocaine belonged to Acosta. Presumably, his implied denial of ownership at trial would seem somewhat more plausible if his conduct and statement at the farmhouse were accompanied by a simultaneous attribution of ownership to another person. However, the district court was faced with competing interests.

■ While Castro had an interest in having his statement presented in context, the court had concurrent obligations both to protect the interests of the co-defendant Pozo (Acosta), who could have been implicated by Castro's full statement, and to consider the interests of judicial economy, which are advanced by a joint trial. By suggesting that the government on direct, and Castro on cross-examination, elicit from Officer Figueroa the essential point Castro wanted to present to the jury, i.e., that Castro "in substance" denied ownership of the cocaine, the court reasonably accommodated these competing interests. The gist of Castro's statement was presented without unduly prejudicing either the right of Pozo to avoid being implicated by a co-defendant's out-of-court statement, or the right of Castro to have his conduct and

2. Fed.R.Evid. 611(a) provides, in pertinent part,

(a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth....

statement presented in context. We cannot conclude that this approach was an abuse of discretion. In any event, any error was harmless.

As a general proposition, an error with respect to admission of evidence will result in reversal of a conviction if it had "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946); *see United States v. Teitler,* 802 F.2d 606, 616 (2d Cir.1986). For an error to be harmless, it must be " 'highly probable' that the error did not contribute to the verdict." *United States v. Corey,* 566 F.2d 429, 432 (2d Cir.1977). However, if the evidence against the defendant is overwhelming, and the prejudice resulting from the error is relatively insignificant, the error is likely to have been harmless. *See Teitler,* 802 F.2d at 616–17.

The evidence that Castro was in possession of the cocaine was very strong. In searching the shopping bag, the agents found the cocaine resting between a credit card receipt bearing Castro's name and what later appeared to be his clothing. Agents also testified that they discovered narcotics and narcotics laboratory equipment in the barn. Further testimony indicated that the smell of ether permeated the farm and surrounding areas, where Castro had been observed for two days. Additionally, when the police commenced the search of the farm, Castro tried to flee, and even fought, albeit unsuccessfully, to avoid apprehension.

Furthermore, the prejudice arising due to admitting the partial account of Castro's conduct and statement was relatively inconsequential. The damage arising from exclusion of his words attributing ownership to Acosta (Pozo) was not likely to be great because the district judge allowed Officer Figueroa to testify that Castro "[i]n substance, ... denied" ownership of the cocaine. Thus, harm to Castro, if any, was in all likelihood neutralized by allowing the jury to hear that Castro denied ownership of the cocaine contemporaneously with admitting his knowledge of its location.

■ We conclude that if the partial admission of evidence of Castro's statement was erroneous, it does not mandate reversal of Castro's narcotics convictions since we believe the overwhelming evidence against him rendered it harmless beyond a reasonable doubt.

Castro suggests that the evidence was insufficient to convict him of manufacturing or possessing cocaine with intent to distribute and of conspiracy to do so. A review of the record convinces us that the evidence against Castro was sufficient to convict him of both narcotics charges.

As to the possession and manufacturing count, as we have noted, Castro admitted his knowledge of the location of 600 grams of 89% pure cocaine, clearly a quantity which a jury could reasonably infer exceeded an amount which might be possessed merely for personal use. The cocaine was found in a shopping bag along with clothing in Castro's size and a credit card receipt bearing his name. From this circumstantial evidence, the jury could infer that Castro exercised the necessary dominion and control over the drug with intent to distribute.

Castro argues that his activities suggested his capacity as a "mere caretaker" at the farm and failed to show that Castro agreed to and actually did participate in a conspiracy to manufacture and possess cocaine with intent to distribute. We cannot agree.

When the search of the premises commenced, Castro attempted to flee. Although mere flight could simply constitute an attempt to remove himself from a suspicious situation, the jury could infer instead consciousness of guilt suggesting involvement in the narcotics activities at the farm under the circumstances we have described. Although Castro was seen at the farm mowing and raking the grass, officers testified that the area around the farm was saturated with ether fumes while Castro was performing these tasks. A jury could infer reasonably that he was aware of the fumes. And, since the evidence presented revealed that ether is a chemical used for processing narcotics, a jury also

might infer from all the evidence herein his knowledge of and participation in the cocaine manufacturing operation.

A search pursuant to warrant of the unlocked sections of the barn revealed extensive equipment which an expert testified was drug-processing equipment, including, *inter alia*, containers of liquid cocaine, sheets of chemical filters, heat-drying guns, triple-beam scales, and laboratory glassware. In considering whether Castro was merely a caretaker at the farm, the jury was free to consider the presence of such equipment in the barn, the length of his presence at the farm, the observation of him conversing with Pozo, and whether he was aware of the cocaine-processing operation.

■ We conclude that sufficient circumstantial evidence existed for a jury to infer that Castro possessed or manufactured cocaine with intent to distribute and conspired with Pozo to do so.

The appellants' remaining arguments warrant only brief discussion.

■ Castro contends that he was denied a fair trial because the jury charge was unfairly balanced in favor of the government. We disagree. First, with respect to the count of assaulting a federal officer, the district court charged,

> the defendant Castro could not be guilty of forcible assault if he believed in good faith that force was necessary to defend himself against an unjustified assault by another person. An honest mistake of fact is not consistent with specific criminal intent.

Tr. 884. We find no support for Castro's contention that he was entitled to specific language in the charge stating that if Castro was unaware that Agent Hunt was a law enforcement officer, Castro was entitled to defend himself. The language in the charge sufficiently instructed the jury on this point. *See United States v. Feola*, 420 U.S. 671, 684–86, 95 S.Ct. 1255, 1263–65, 43 L.Ed.2d 541 (1975) (defendant need not be aware he is assaulting federal officer in particular).

■ Castro next complains that the district court did not "explain to the jury, in appropriate language, that flight does not necessarily reflect feelings of guilt, and that feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt." *Miller v. United States*, 320 F.2d 767, 773 (D.C.Cir.1963) (Bazelon, Ch.J., concurring) (quoted in *Austin v. United States*, 414 F.2d 1155, 1157 (D.C.Cir.1969)). Judge Brieant, with respect to flight, charged that whether flight indicated consciousness of guilt was a question of fact for the jury, and stressed that by stating that flight "may be treated ... as evidence of consciousness of guilt," he did not mean to suggest that the defendant had "demonstrated consciousness of guilt." The judge further cautioned that flight created no presumption of guilt. We believe that these cautions ensured that the instruction on flight was sufficiently balanced so as to enable the jury to consider the issue fairly.

We decline to disturb Castro's convictions on the basis of the claimed errors in the jury charge.

■ Pozo suggests that the assault charge against co-defendant Castro was improperly joined with the narcotics counts charged against Pozo. However, joinder is proper where the defendants are alleged to have participated in "the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). The charged assault appears to have arisen out of Castro's attempt to escape arrest for the narcotics crimes charged against both defendants. Pozo fails to suggest how the jury might have failed, despite an instruction by the judge, to segregate the assault evidence against Castro from the narcotics evidence against Pozo. We conclude that joinder was proper.

Finally, we find the sentence imposed upon Pozo by the district court to be well within the bounds of a proper exercise of discretion.

We have considered the appellants' other arguments, and we find them unpersuasive. To the extent that each appellant has

adopted the arguments of the other, they are without merit.

Affirmed.