**UNITED STATES of America, Appellee,**

v.

**Pietro TUSSA, Rajan Patiwana, Pietro Amato, and Paolo Zummo, Defendants-Appellants.**

Nos. 1298, 1344, 1348 and 1299, Dockets 85-1474, 86-1058, 86-1079 and 86-1101.

United States Court of Appeals, Second Circuit.

Argued June 2, 1986.

Decided April 6, 1987.

Raphael F. Scotto, Brooklyn, N.Y., for defendant-appellant Pietro Tussa.

Nathan Z. Dershowitz, New York City (Victoria Eiger, Dershowitz & Eiger, New York City, and Alan M. Dershowitz, Cambridge, Mass., of counsel), for defendant-appellant Rajan Patiwana.

Russell J. Carbone, Queens, N.Y., for defendant-appellant Pietro Amato.

Robert F. Katzberg, New York City (Kaplan & Katzberg, New York City, of counsel), for defendant-appellant Paolo Zummo.

Before NEWMAN, PIERCE and MINER, Circuit Judges.

PIERCE, Circuit Judge:

These appeals are from judgments of conviction entered after a jury trial in the United States District Court for the Eastern District of New York, Herbert N. Maletz, *Judge*.[1] The appellants were convicted of possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1982), and conspiracy to possess heroin with intent to distribute, in violation of 21 U.S.C. § 846 (1982). Appellant Amato principally argues that the district court erred (1) by basing denial of his motion to suppress on a finding that probable cause existed for his warrantless arrest; (2) by admitting certain evidence during the trial of other crimes committed by co-defendant Tussa and by Amato himself; and (3) by failing to grant Amato's motion to dismiss pursuant to Fed.R.Crim.P. 29 for insufficient evidence. Appellant Tussa also argues that his arrest lacked probable cause and that the admission of evidence relating to his and Amato's other crimes was error. Patiwana and Zummo contend that the district court erred in allowing a government agent to testify during the trial regarding alleged hearsay statements purportedly made by a confidential informant. Zummo further argues that the admission of similar acts evidence against Amato and Tussa had prejudicial "spill-over" effects as to him and thus requires reversal. Patiwana argues, *inter alia*, that the district court

Joan M. Azrack, Asst. U.S. Atty., Brooklyn, N.Y. (Reena Raggi, U.S. Atty., E.D. N.Y., Allyne R. Ross, Jane Simkin Smith, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.

1. Senior Judge of the United States Court of International Trade, sitting by designation.

erred during the trial when it (1) admitted certain fingerprint evidence on rebuttal; (2) refused to compel the government to name the confidential informant; and (3) admitted evidence of certain prior consistent statements.

After reviewing these and other claims presented by appellants, we affirm the convictions of Tussa and Amato, reverse the convictions of Patiwana and Zummo and remand for a new trial as to them.

## BACKGROUND

The government's theory at trial was that Patiwana and his partner, one Ashok Vaswani, sold two kilograms of heroin to Tussa, Amato and one Joseph Spatola, and that Zummo served as the "middleman" in the deal. As discussed below, the evidence suggested that Zummo took part in a series of meetings, some with Tussa, Amato and Spatola, and some with Patiwana. Eventually, Spatola, Zummo and Patiwana met, followed soon thereafter by delivery of two kilograms of heroin by Spatola to Amato and Tussa. At trial, agents of the Federal Bureau of Investigation ("FBI"), who surveilled appellants and others, testified about appellants' various movements in connection with the charged two kilogram heroin deal, which allegedly took place on March 13, 1985.

The agents testified that they observed Tussa, Amato, and Joseph Spatola meet outside Spatola's apartment in Queens, New York, at about 11:00 a.m. on March 13.[2] About forty-five minutes later, Amato and Tussa left Spatola and proceeded to the Cafe Aiello. Spatola walked away, and for a short time the surveilling agents lost track of him. Agent Mauzey testified that Tussa, who had entered the cafe, came outside at least three times and looked around. A short while later, Spatola, who apparently arrived at the cafe before Amato and Tussa, was observed leaving the cafe with Paolo Zummo, who returned soon thereafter. Minutes after returning, Zummo again left the cafe, followed about a

minute later by Amato and Tussa, who drove off in Amato's car, a white Buick.

The agents followed Amato and Tussa to the Cafe Mondello. Shortly thereafter, Spatola arrived driving a blue Fiat. The three remained outside the cafe for approximately an hour, occasionally looking up and down the street. At one point they walked up the block and entered Vito's Pork Store. One agent noticed Tussa looking out the window of the store. Tussa then left the store and looked up and down the block.

Meanwhile, another team was tracking the movements of Zummo, who was driving a Lincoln Continental. After leaving the Cafe Aiello, Zummo drove to the Park East Shopping Center in Garden City Park, Nassau County. Zummo met appellant Rajan Patiwana at the shopping center, whereupon the two went into a Burger King Restaurant briefly, then, after dropping Patiwana off at his car, a Mercedes Benz, Zummo drove to Howard Johnson's Restaurant in Searington, Nassau County.

Patiwana drove to Howard Johnson's on Jericho Turnpike near the Park East Shopping Center, where he met Ashok Vaswani. After about thirty minutes, Vaswani and Patiwana drove together to the latter's home, a two family residence also near the shopping center, where they remained for about a half-hour. The two then left; Patiwana drove and Vaswani, carrying a brief case, walked to the shopping center. Patiwana arrived first and waited. When Vaswani arrived, he walked by Patiwana and entered a Pathmark Supermarket. An agent noted that as Vaswani walked by Patiwana, neither acknowledged the other. The agent followed Vaswani, who pushed a shopping cart up and down the aisles but put nothing in the cart other than his brief-case. Patiwana remained outside.

After about an hour, Vaswani left the supermarket with the briefcase and a small plastic Pathmark bag, which bag appeared to contain some paper products. Once

---

**2.** Unless otherwise indicated, all testimony herein relates to events said to have occurred in Queens County.

again, Vaswani passed Patiwana without acknowledgment. Patiwana made a phone call at a public phone, and then drove away in the Mercedes. Shortly after 4:00 p.m., Vaswani walked back toward Patiwana's residence and entered it. Soon thereafter, Vaswani left Patiwana's residence carrying the briefcase and plastic Pathmark bag and took a taxi to an apartment building on 67th Avenue, which he entered at about 5:20 p.m.

In the meantime, Spatola, Amato and Tussa had returned to the Cafe Mondello and remained there until 1:20 p.m. When they left, Spatola drove the Fiat and Amato and Tussa rode in the Buick. All three drove to the Palace Diner on Main Street and entered the diner together. Shortly thereafter, one Nicolo Argano also went inside. The trio and Argano remained in the diner for about an hour. Around 2:40 p.m., Spatola, Amato and Tussa were observed leaving and talking together. They drove the two cars to the Howard Johnson's Restaurant in Searington. At this location, they conversed; then Spatola met with Zummo, who had arrived separately. Briefly, Spatola walked out of the parking lot, then returned and entered Zummo's car, and the two drove away. A short while later, Zummo and Spatola reappeared at the same parking lot and Spatola left the car. Spatola again met with Amato and Tussa. Finally, Zummo drove away in his Lincoln; Amato followed in his Buick.

At this time, Spatola and Tussa remained in the Howard Johnson parking lot in Searington. Nicolo Argano reappeared and met with Spatola in the parking lot for a short while as Tussa waited in the driver's seat of Spatola's Fiat. These three men then left the parking lot; Tussa drove the Fiat with Spatola, and Argano drove his own car, a brown Ford. They drove to the "Your Place or Mine" bar, where Amato and Zummo waited. Amato was then sitting with Zummo in the Lincoln Continental. Spatola approached the Lincoln, conversed with Zummo and Amato, returned to Tussa in the Fiat and waved to Argano. The Ford, the Fiat and the Lincoln were driven to the Park East Shopping Center, where they were parked far apart. Spatola

and Amato entered Argano's car, and the three drove to the far end of the lot.

At 5:16 p.m., Patiwana, who had left the lot about an hour earlier, returned in his Mercedes and parked. Zummo entered the Mercedes for a few moments, and then returned to his car. Patiwana then drove to the corner of the lot, where there were several public phones. As Patiwana spoke on the phone, Zummo waved to Spatola, who had returned to the Fiat with Tussa and Amato. Spatola then left the Fiat and got into the Lincoln with Zummo. Zummo drove the car to the end of the lot where Patiwana was parked.

Patiwana hung up the phone, walked over to the Lincoln, spoke with Zummo and Spatola, then moved his Mercedes to another place in the lot. He then walked over to Zummo and Spatola, who were in the Lincoln. Zummo, Spatola and Patiwana then took a fifteen-minute ride in the Lincoln around the nearby residential area, retracing the same route several times, after which Zummo and Spatola drove Patiwana to his residence and then returned to the Park East Shopping Center parking lot without him.

When Zummo, Spatola and Patiwana left the lot, at about 5:20 p.m., Tussa and Amato remained in the lot, now sitting in the Fiat—Tussa in the driver's seat, Amato in the back seat. When Zummo and Spatola returned to the shopping center, Spatola left the Lincoln and headed toward Tussa and Amato in the Fiat. As Spatola approached, Amato shouted something, after which Spatola and Tussa went to a public phone and made a call. After the call, Spatola returned to Zummo's Lincoln and Tussa returned to the Fiat, where Amato still waited.

Shortly thereafter, Zummo and Spatola drove the Lincoln out of the lot, picked up Patiwana, who had walked over from his home and was waiting just outside the lot, and drove away. Shortly after 6:00 p.m., the three men arrived at the building on 67th Avenue in Queens that Vaswani had entered earlier in the day. As Patiwana left the car, he looked up and down the

street, and entered the building. Agent McShane noted that Patiwana was not carrying anything in his hands.

Minutes later, Patiwana left the building. As to what happened next, the witnesses' testimony diverges. Agent McShane testified at a suppression hearing and at trial that he saw Patiwana concealing under his coat a white package that McShane thought looked like a white paper bag with white handles. Agent Uniacke, on the other hand, testified at trial that he did not notice a white package under Patiwana's jacket. Also, the doorman of the building testified that Patiwana was not carrying anything as he left the building.

Thereafter, Patiwana reentered the car and with Zummo and Spatola returned to the shopping center. The agents followed them. Upon arrival, at approximately 6:40 p.m., Patiwana left the car and entered the Pathmark store; Zummo then parked the car in the lot. Spatola left Zummo's car carrying a white shopping bag and walked over to Amato and Tussa, who were still waiting in the parked Fiat. As the men talked, Spatola placed the white bag on the back seat of the Fiat.

At that point, the agents converged on the Fiat. Spatola, Amato, and Tussa were arrested immediately, Patiwana was arrested as he walked up and down the supermarket aisles pushing a shopping cart. Agents arrested Vaswani later that same day and Zummo, who left the scene in his car, was arrested days later. After the arrests, a search of Tussa revealed that he was carrying a small packet containing 70% pure heroin. Analysis revealed that the white shopping bag recovered from the back seat of the Fiat contained two kilograms of 55% pure heroin. Vaswani was released after the district court dismissed the complaint as to him for lack of probable cause.

Following indictment and a jury trial, Zummo, Patiwana, Amato and Tussa[3] were all convicted of one count of possession of heroin with intent to distribute, 21 U.S.C. § 841(a)(1) (1982), and one count of conspiracy to possess heroin with intent to distribute, 21 U.S.C. § 846 (1982).[4]

## DISCUSSION

### I.

■ Appellants Tussa and Amato argue, *inter alia,* that their warrantless arrests were made without probable cause, that the motions to suppress evidence seized as a result of their arrests should have been granted following the suppression hearing, and that their convictions should therefore be reversed and the indictment dismissed. These appellants argue in short that at no time was either of them seen committing a crime, or handling the white bag, or heard discussing a drug transaction. However, at the suppression hearing extensive testimony was presented which substantially tracks the trial testimony outlined above. The appellants engaged in a series of meetings throughout the day and often exhibited behavior from which it could be concluded that they were concerned about surveillance. Specifically, they frequently looked around to see if they were being watched, and often drove evasively as though to discourage surveillance. The surveillance culminated in the agents observing the delivery of a package to the car in which Amato and Tussa waited. Upon the detailed evidence outlined above, trained law enforcement officers certainly could reasonably believe that a drug transaction had taken place, and that Amato and Tussa took part in it. *See United States v. Webb,* 623 F.2d 758, 761 (2d Cir.1980) (essence of probable cause is reasonable, objective belief in the suspect's guilt).

---

**3.** The charges against Spatola were disposed of separately.

**4.** Judge Maletz sentenced Amato to twelve years imprisonment on each count to run concurrently and a $25,000 fine; Patiwana to twelve years imprisonment on each count to run concurrent-

ly and a $50,000 fine; Zummo to eight years imprisonment on each count to run concurrently and a $25,000 fine; and Tussa to six years imprisonment on each count to run concurrently. Appellants presently are serving their sentences.

■ Tussa contends that Agent Kearney, whom he claims was the arresting officer, lacked personal knowledge of facts that could give rise to probable cause to arrest. Assuming this to be so, it is irrelevant since the record reveals that Agent Colgan had monitored the surveillance teams on a radio with three frequencies and became aware of the defendants' various activities throughout the day. Having gained knowledge of the relevant facts by monitoring the radio and after observing the final delivery, Agent Colgan gave the arrest signal to the other agents. We conclude that the agents had sufficient information upon which to make an arrest of Amato and Tussa based upon probable cause. We have considered the other arguments of Tussa and Amato relating to probable cause and conclude that they do not merit discussion.

## II.

■ Amato argues that the evidence was insufficient to support his convictions for possession and conspiracy to possess with intent to distribute heroin. Again, Amato contends that he was never in physical possession of the subject narcotics, nor was he overheard discussing narcotics with anyone. However, viewing the evidence in the light most favorable to the government, and acknowledging that the jury was free to draw reasonable inferences from the evidence, *see United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983), we cannot conclude that no "rational trier of fact could have found the essential elements of the crime[s] charged beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). According to the record evidence, Amato met with Spatola, Zummo and Argano throughout the day on March 13, 1985, and took part in discussions with them. This situation differs substantially from that in *United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir.1984), wherein this court stated that

mere contact with drug dealers cannot establish participation in a conspiracy to distribute narcotics. Here, the evidence showed that Amato waited in a car in the parking lot for the delivery. The white bag containing two kilograms of heroin was placed on the back seat of that car by Spatola. Thus, the conspiracy theory was supported by more than mere association with co-conspirators. *Cf. United States v. Diez*, 736 F.2d 840, 843 (2d Cir.1984) (under similar circumstances, evidence held sufficient for conspiracy to distribute where defendant was present in and drove car from which narcotics were delivered).

■ Amato argues that in *Gaviria* intent to possess for distribution could not be found where seven grams of cocaine were merely found in the back seat of a car driven by the defendant. However, in the instant case, the evidence indicates that the heroin *was placed in the back seat while Amato was in the car.* It was not necessary for Amato actually to have touched the bag of heroin in order to have been found guilty of possession of heroin. In light of the evidence tending to show that Amato took part in the negotiations leading to the delivery of the package, a jury could rationally infer that Amato exercised the necessary dominion and control to have constructively possessed the heroin with intent to distribute. *See Gaviria*, 740 F.2d at 185 (defendant's possession of keys to apartment and box where cocaine found sufficiently established possession; large quantity allows jury to infer intent to distribute); *United States v. Damsky*, 740 F.2d 134, 139–40 (2d Cir.) (evidence of possession sufficient where defendant accepted keys to camper knowing that it contained hashish), *cert. denied*, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984); *see also United States v. Gomez*, 529 F.2d 412, 419 (5th Cir.1976) (evidence of constructive possession sufficient where defendants rode in car which followed truck containing marijuana and had "working relationship" with person who loaded truck). We conclude that sufficient evidence was presented to the jury to support Amato's convic-

tions for violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.

## III.

Appellants complain that during cross-examination of Agent Kearney, the government elicited from him testimony that a confidential informant had told him that on March 13, 1985 Patiwana carried the heroin to the car. Appellants assert that it was error for the district court to have admitted this hearsay evidence.[5] We agree.

Agent Kearney was called as a defense witness by Patiwana's counsel. Under defense questioning, Kearney, the case agent, admitted that during the week after the appellants' arrests, the period during which several arraignments were held, McShane did not tell him of his observation of Patiwana concealing the white shopping bag under his coat. Apparently, it was not until March 19, six days after McShane's surveillance, that McShane informed Kearney of his observation.

No doubt, defense counsel hoped that the jury would draw the inference that, given the importance of an observation of Patiwana with the bag, Agent McShane, prior to the arraignments, surely would have told Kearney, the case agent, what he saw when Patiwana left the building on 67th Avenue. This, perhaps, would lead the jury to infer further that since McShane did not immediately tell Kearney that he saw a bag, he might have invented this account at a later date.

The prosecution asserted that the jury was being misled, and the district judge agreed. The district judge then permitted Agent Kearney to testify on cross-examination by the government that a confidential informant had told him that Patiwana carried the heroin out of the building, and that Kearney related this fact to the magistrate:

Q Agent Kearney, ... who told you that Patiwana brought heroin to the car?

A You are referring on [sic] 67th Avenue when the package came from the apartment building to the vehicle in question.

Q Yes.

A That was told to me by a confidential informant.

. . . .

Q Did you advise the magistrate on March 19th of your information from the confidential informant? [Objections by all defense counsel.]

A Yes.

The relevant portions of the transcript are set out more completely in the margin.[6]

---

5. Appellants also argue that the court should have compelled the government to disclose the informant's identity. We find it unnecessary to reach this issue.

6. The testimony on this matter follows:
EXCERPT OF DIRECT EXAMINATION OF AGENT JAMES KEARNEY BY MR. LA ROSSA

. . . .

Q Now, sir, let's go back to March 13th. After Mr. Patiwana was arrested, you were assisting Assistant United States Attorneys, weren't you?
A Yes, I was.
Q You came to this courthouse on March the 14th, did you not?
A Yes, I did.
Q In fact, you were here on the 14th, the 18th and the 19th of March, isn't that right?
A Yes, sir.
Q Now, sir, before you came to this courthouse on the 14th, did you, sir, have discussions with other agents?
A Yes, I did.
Q Did you find out, sir, whether any agents observed the premises on 67th Avenue?

A Yes, I did.
Q Did you find out, sir, what they saw? For example, did you find out that they saw Mr. Patiwana enter that premises that evening?
A Yes.
Q Did you find out from them that they saw Mr. Patiwana leave the premises that evening?
A Yes.
Q It was your purpose, sir, was it not, before the 14th, to attempt to get every fact possible so you could present it to a federal judge that day, isn't that right?
A Yes, sir.
Q That means every fact that you believed was important, sir, with respect to Mr. Patiwana's action on the 13th, isn't that right?
A That's correct.
Q Did you, sir, tell a federal judge on the 14th that one of your brother agents observed Mr. Patiwana exiting those premises with a white shopping bag sticking out of a jacket?
A No, I did not.
Q Did you, sir, as the case agent, that day, in this building, have conversations with the Assistant United States Attorney?
A Yes, I did.

The appellants argue that the admission of the confidential informant's out-of-court statement was an improper admission of hearsay, and that reversal is required. The government argues that the informant's statement was not hearsay because it was not offered to prove the truth of the assertion by the informant, but instead to rebut the defense's implication that McShane fabricated his testimony as to the bag being seen under Patiwana's jacket.

### A.

■ Hearsay is defined by the Federal Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the matter asserted." Fed.R.Evid. 801(c). Accordingly, the informant's statement would be inadmissible as proof that Patiwana carried the heroin to the car. Fed.R.Evid. 802; *see Moore v. United States*, 429 U.S. 20, 21–22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976) (per curiam); *United States v. Ocampo*, 650 F.2d 421, 427–28 (2d Cir.1981). The government urges that the defense opened the door for the admission of the informant's statement by putting in issue the credibility of Agent McShane. Thus, the government asks us to view the testimony as to the informant's alleged statement as offered only on the issue of whether Agent McShane fabricated his testimony, not as evidence offered to prove that Patiwana delivered the heroin. The court gave a limiting instruction to the jury intended to ensure that the jury used the testimony as to the informant's statement only to show Agent Kearney's state of knowledge when he appeared before the magistrate. See note 6, *supra*.

We do not agree with the government's view of this evidence. It seems clear that for one week Agent McShane did not tell Agent Kearney about seeing the bag under Patiwana's coat; and we agree that this could give rise to an inference in the jurors' minds that, since he did not report this to Kearney, the case agent, for several days, McShane in fact never made such an observation and fabricated his testimony about it. We are presented with the issue of whether the unidentified informant's alleged statement provides any insight as to *why* Agent McShane did not come forward with his information sooner than he did. While the informant's alleged statement may help explain why Agent *Kearney* did

Q  Did you, sir, tell the [AUSA] on the 14th that Mr. Patiwana was observed leaving those premises with a white shopping bag sticking out of his jacket?
A  No.
Q  You didn't tell anybody that because nobody told you that?
A  That's correct.
Q  Isn't that right?
A  That's correct.
Q  And nobody told you that on the 15th either, right?
A  That's correct.
Q  Or the 16th?
A  That's correct.
Q  Or the 17th?
A  That's correct.
Q  In fact, right up until the 19th, when you made the third presentation, isn't that right?
A  18th or 19th, yes, sir.
Tr. at 2063–65.
EXCERPT OF CROSS EXAMINATION OF AGENT JAMES KEARNEY BY MS. AZRACK:
. . . .
[Colloquy re admissibility of informant's statement.]
Q  Agent Kearney, . . . who told you that Patiwana brought heroin to the car?
. . . .

[Mr. La Rossa]: Excuse me. I object to the form of that question.
THE COURT: I will overrule that objection.
MR. LA ROSSA: Only the prefatory, not the latter part, your honor.
THE COURT: The objection has been overruled.
A  You are referring on [sic] 67th Avenue when the package came from the apartment building to the vehicle in question.
Q  Yes.
A  That was told to me by a confidential informant.
. . . .
Q  Did you advise the magistrate on March 19th of your information from the confidential informant?
[Objections by all defense counsel.]
A  Yes.
MS. AZRACK: That's all.
THE COURT: Ladies and gentlemen of the jury, I want to give you the following instruction.
   Agent Kearney's testimony regarding his information from an unnamed individual is to be considered by you solely for the purpose of showing the state of Agent Kearney's knowledge on March 13th and for no other purpose.
Tr. at 2099–2100, 2112–13.

not specifically ask McShane whether he saw a bag under Patiwana's coat, we cannot understand how it could explain why *McShane* did not tell the case agent, Kearney, prior to the arraignments about seeing the bag under Patiwana's coat.

### B.

The government argues that the jury might have inferred from Kearney's testimony on direct examination by defense counsel that McShane did not tell Kearney about seeing the bag under Patiwana's coat because McShane did not see it there. The government therefore urges that the evidence about the confidential informant's alleged statement to Kearney was properly admitted to explain why Kearney did not immediately ask McShane whether Patiwana carried anything under his coat—i.e., it was unnecessary for Kearney to ask because the confidential informant told him that Patiwana had carried the heroin to the car. Perhaps, in some small way, this would reduce the possibility of an inference being drawn that McShane fabricated his testimony because it could indicate that Kearney never asked him what he saw.

We think that if this evidence was probative at all on this issue, the probative value was far outweighed by the prejudice to the defendant arising from its admission. *See* Fed.R.Evid. 403. Any probative value it possessed would be quite low because, even after the admission of this evidence, the jury still knew that McShane did not immediately volunteer his important observation to Kearney. The key point is that Kearney's state of mind says little, if anything, about why McShane did not come forward with his information for several days. We consider it of major importance that the likelihood of significant prejudice arises from the strong possibility that the jury made improper use of the evidence, i.e., as proof that Patiwana did indeed carry the heroin from the building to Spatola, a fact which is central to proving the crimes charged against Patiwana. It becomes evident that McShane's testimony and the unidentified informant's alleged statement were pivotal when one notes that Agent Uniacke testified that he did not observe Patiwana carrying anything as he left the building, and more specifically that the doorman testified that Patiwana did not appear to be carrying a package under his jacket.

In sum, since it is the knowledge of McShane which was at issue, and since Kearney's testimony goes only to the state of Kearney's knowledge, not McShane's, we conclude that the admission of the hearsay statement by an alleged unidentified informant concerning a highly material and disputed issue was serious error.

### C.

The government next argues that even if the district judge erred in admitting the informant's statement, the error was cured by the district court's limiting instruction and was therefore harmless. Fed.R. Crim.P. 52(a) reads: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The main purpose of this rule is to ensure that appeals courts do not become slaves to technical errors—forced to reverse any conviction upon the finding of any, even harmless, error. *See Kotteakos v. United States*, 328 U.S. 750, 759–60, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557 (1946); R. Traynor, The Riddle of Harmless Error 13–17 (1970); 3A C. Wright, Federal Practice & Procedure § 852, at 295–97 (2d ed. 1982); Holtzoff, *Shortcomings in the Administration of Criminal Justice*, 17 Hastings L.J. 17, 26–33 (1965); *see also* Taft, *Administration of Criminal Law*, 15 Yale L.J. 1, 15 (1905). Our inquiry must be whether, viewing the record as a whole, the error had substantial and injurious effect or influence in determining the jury's verdict. *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1247–48; *United States v. Teitler*, 802 F.2d 606, 616 (2d Cir.1986); *Carson*, 702 F.2d at 362; *see also* R. Traynor, *supra*, at 58 ("most errors must be evaluated in relation to the risk of their effect on the judgment"). This inquiry reflects our primary concern with ensuring a fair trial. *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). This

court has stated that in order to find harmless error, we must find it " 'highly probable' that the error did not contribute to the verdict." *United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977); *see also United States v. Castro*, 813 F.2d 571, 577 (2d Cir.1987).

■ Although "[c]onvictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused, ... the substantial safeguards to those charged with serious crimes cannot be eradicated under the guise of technical departures from the rules." *Smith v. United States*, 360 U.S. 1, 9, 79 S.Ct. 991, 996, 3 L.Ed.2d 1041 (1959) (citations omitted). Even if an appellate court is without doubt that a defendant is guilty, there must be a reversal if the error is sufficiently serious. *See Bollenbach v. United States*, 326 U.S. 607, 615, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946); *United States v. Bozza*, 365 F.2d 206, 218 (2d Cir.1966) (Friendly, J.). The admission of the evidence of the alleged informant's purported statement was extremely prejudicial to Patiwana and Zummo because it went to the heart of the relationships among the defendants. The government's theory at trial was that Tussa, Spatola and Amato were the intended buyers of the heroin, that Zummo was the middleman, and that Patiwana was the supplier.

As to Patiwana, the import of linking the bag to him is obvious. If it were proved that Patiwana possessed the bag, it is a very short step to conclude that he delivered the heroin to Spatola, who in turn delivered it to Amato and Tussa.

Much of the evidence with respect to Zummo centered upon his role as a middleman in the transaction—his series of meetings with both the alleged seller, Patiwana, and the alleged buyers, Tussa, Spatola and Amato. Thus, evidence that the bag was delivered by Patiwana to Spatola would be very damaging to Zummo because it tends to show that the purpose of those meetings was indeed to arrange a heroin sale.

■ Evidence of delivery of the bag of heroin by Patiwana to Spatola certainly increased greatly the probability of conviction of Patiwana and Zummo. We therefore hold that the admission of the challenged statement by an alleged informant was not harmless error with respect to Patiwana and Zummo.

With respect to Amato and Tussa, we believe that the error was harmless. First, the evidence against them was overwhelming. Spatola delivered the bag of heroin to them as they waited in Spatola's Fiat. As discussed, they spent the entire day in question meeting with the others and often acted as if they were concerned that they might be surveilled. Given the delivery of the heroin to them by Spatola, the question of who delivered the heroin to Spatola seems relatively insignificant with respect to Amato and Tussa. *See Castro, supra*, at 577 (where evidence against defendant overwhelming, and prejudice arising from error relatively insignificant, error likely harmless). We hold that the admission of the alleged informant's statement was harmless error with respect to Amato and Tussa.

## IV.

Appellants argue that it was error for the district court to have admitted certain fingerprint evidence as part of the government's rebuttal case. The evidence consisted of fingerprints on the shopping bag which contained the heroin; the fingerprints were identified as those of Vaswani. This evidence was important since the government's theory at trial was that Vaswani delivered the heroin to the building on 67th Avenue, where Patiwana later picked it up. As outlined above, Patiwana visited that building after Vaswani had gone there with the bag; he then rode with Spatola back to the shopping center just before Spatola delivered the bag to the Fiat in which Amato and Tussa waited. The appellants complain that although they made a request long before the trial for all scientific tests made by the government, the government did not notify the appellants

that this evidence existed until the morning of the trial.[7]

Appellants objected to the use of the fingerprint evidence, and the court reserved decision. After opening arguments, the court ruled that the fingerprints were inadmissible because the surprise would prejudice the appellants' defense. However, after the close of the defense case, the court ruled that the evidence could be introduced as part of the government's rebuttal case. The government argues that the evidence was properly admitted since Patiwana's counsel "opened the door" by asking questions of Agent Alleva designed to give the jury the impression that the government agents did not do certain scientific tests that were available to them. Appellants argue that the fingerprint evidence was not relevant to any impression the jury might form as to whether the government did or did not perform appropriate scientific tests because the fact of fingerprint analysis says nothing about the tests that the government did not perform. Appellants argue that the real purpose for which the government proffered the evidence was to prove that Patiwana had delivered the bag of heroin to Spatola. The admission of this evidence, they urge, constituted trial by surprise which prevented appellants' counsel from adequately planning their trial strategy on behalf of their clients.

Since we reverse as to Patiwana and Zummo on the grounds discussed above and conclude for essentially the same reasons discussed in Part 111.C, *supra,* that any error in the admission of the fingerprint evidence was harmless as to Amato and Tussa, we find it unnecessary to decide whether admission of the fingerprint evidence was error.

### V.

■ Amato and Tussa finally argue that certain evidence of prior narcotics related crimes should not have been admitted against them. They argue that it was improperly admitted as evidence of propensity to commit such crimes because Amato and Tussa did not put intent in issue. Fed.R. Evid. 404(b). Given that the defense of Amato and Tussa focused upon showing that their activities were not related to a drug transaction despite the delivery of the heroin to the car in which they were sitting, it seems clear that intent to participate clearly was in issue. Certainly, the issue was not removed from the case. See *United States v. Figueroa,* 618 F.2d 934, 942 (2d Cir.1980). Judge Maletz instructed the jury that the evidence could not be considered as proof of propensity to commit a crime or of bad character or that the earlier crimes were part of the conspiracy at issue. We see no reason to conclude that the jury did not follow these limiting instructions. See *United States v. Ebner,* 782 F.2d 1120, 1126 (2d Cir.1986).

### CONCLUSION

For the foregoing reasons, we reverse the judgments of conviction against Patiwana and Zummo and remand for a new trial. Since we reverse on the grounds stated above, we need not discuss the remaining claims of error of Patiwana and Zummo. We have carefully considered the remaining arguments of Amato and Tussa, and have found them to lack merit. We affirm the convictions of Amato and Tussa.

---

**7.** The government explained, apparently to the district court's satisfaction, that it mistakenly had sent the wrong bag for fingerprint analysis and that the error was not discovered and corrected in time for the government to inform the defendants of the results any sooner.