**Timothy M. ROBINSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 91–CF–1278.**

District of Columbia Court of Appeals.

Argued March 11, 1993.
Decided May 4, 1993.

---

Samia Fam, Public Defender Service, with whom James Klein, Jo–Ann Wallace, and Derek Sells, Public Defender Service, Washington, DC, were on the brief, for appellant.

Steven J. Durham, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and J. Edward Agee, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN and TERRY, Associate Judges, and GALLAGHER, Senior Judge.

FERREN, Associate Judge:

Appellant Timothy M. Robinson challenges his convictions for second degree murder while armed and for carrying a dangerous weapon under D.C.Code §§ 22–2403, –3202, and –3204 (1989 Repl. & 1992 Supp.). Appellant's primary contention on

appeal[1] is that the trial court abused its discretion in admitting in evidence (1) his videotaped admission of drug use and (2) testimony concerning an alleged assault by appellant that took place two nights after the murder for which he was charged. Appellant argues that both his admission of drug use and the testimony concerning the alleged assault constituted other crimes evidence that should have been excluded under *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), and its progeny. We agree and accordingly reverse appellant's convictions.

## I.

A grand jury indicted appellant for the murder of Faith Mobley. At trial, Gladys Baxter testified that sometime between 4:00 a.m. and 4:45 a.m. on May 20, 1989, she was looking out her bedroom window when she saw Mobley walking up Field Place, N.E., toward Eastern Avenue, followed by a black male. Shortly afterwards, Baxter heard Mobley say, "Oh no. Stop." When Baxter went outside to investigate, she found Mobley lying down at the gate in front of Mobley's house. Police arriving on the scene discovered that Mobley was bleeding profusely. Mobley died as a result of four stab wounds to the torso, according to the subsequent autopsy. The medical examiner also concluded that, because of their distinctive form, these wounds had been inflicted by a knife that must have been double-edged along at least a portion of the blade. No murder weapon was ever produced at trial.

Baxter identified appellant both at a line-up and in court as the man whom she had seen following Mobley. Baxter's previous out-of-court identifications were more equivocal, however. In a statement given to police the day after the murder, Baxter said that she wasn't sure whether she would be able to recognize Mobley's assailant if she were to see him again. Shortly after the murder, Baxter described the man that she had seen following Mobley as being light-skinned, tall, thin, clean-shaven, with short hair, and in his early twenties. The defense presented evidence, however, that appellant is only 5'8" tall and that, at the time of the murder, he was thirty-four years old and had a moustache. The record also reflects some dispute as to whether appellant could be properly described as light-skinned. When police first showed Baxter a photo array, she said that three photos resembled Mobley's assailant; appellant's photo was not in this array. When Baxter was shown another array, she initially selected four photos as possibly portraying the murderer. She then picked appellant's photo out of this group, saying, "If this guy here were thinner I'd say it was him." However, in a statement taken by investigators for the defendant, Baxter indicated that she would label her degree of certainty as to her identification of appellant as only three on a scale of one to ten, with ten being the highest degree of certainty.

Appellant's nephew, Jeffrey Boddie, testified for the government that appellant had been living with Boddie's family at 5510 Nannie Burroughs Avenue at the time of Mobley's murder. According to Boddie, appellant came into Boddie's room on the morning of the murder and said that he had stabbed somebody up the street "because she didn't do what she was supposed to do." Boddie also said that he saw appellant take out a butcher knife with a wooden handle and a blade eight or nine inches long, sharp on one side but completely blunt on the other. He did not see any blood on the knife or on appellant, however. Boddie testified that he told his mother about this incident the next morning, which his mother confirmed at trial, although she was not entirely sure about the date. Boddie made no effort to tell police about his uncle's supposed confession, however, until the police approached him. Boddie acknowledged at trial that he had been afraid that he might be suspected of the murder

---

**1.** Appellant also claims that the trial court erred in failing to declare a mistrial after three references to his prior criminal history. Given our disposition of the first issue on appeal, we need not address this claim, especially since the references appear to have been inadvertent and, therefore, not likely to be repeated in the event of a retrial.

himself or charged with selling drugs if he failed to cooperate in the investigation. Boddie also admitted that he had shared two fifths of brandy with two friends during the evening before the murder and that he had smoked five or six PCP cigarettes, which he used regularly, during the previous day. The defense later presented expert testimony showing that PCP users are frequently subject to delusions.

Rose Futrell testified for the government that shortly before midnight on May 22—two nights after Mobley's murder—she saw appellant walking up the sidewalk while she was parking her van in front of her house at 5537 Jay Street, N.E., just a few blocks from the murder scene. Appellant stopped suddenly about ten feet [2] away from the van, on the passenger side. He was holding an object with a dark-colored handle in his hand, pointing it slightly upward. Although Futrell acknowledged that she could not see the rest of the object because it was covered with a brown paper bag, she surmised that it was a butcher knife. The only ground that she ever gave for this conjecture was that "the bag wasn't full of anything." According to Futrell, appellant stood outside her van for

about five minutes looking at her. When she picked up her car phone to dial 911, he ran away.

Finally, the government played for the jury appellant's videotaped statement, including his admission that he had shared crack with women, followed by sex.[3] Although the government did not refer to the tape in its closing argument, it argued in a pretrial hearing that this statement would help to supply a motive for the slaying, *i.e.*, that appellant killed Mobley because she had failed to have sex with him after he had given her crack.

The defense sought to show that another early suspect in the murder investigation, James Spriggs, might have killed Mobley. William Jerome Collins, a Field Place resident, testified that on the morning of Mobley's murder, he saw Spriggs playing with a folding knife in the neighborhood. According to Collins, Spriggs was about six feet tall, slender, twenty-one, and clean-shaven at the time of the murder.[4] Later on the morning of May 20, at around 7 a.m., Collins saw Spriggs again; Spriggs's "lip was bust" and swollen and he had changed clothes. A neighborhood drug

2. In her earlier testimony at the *Drew* hearing, Futrell said that appellant stopped five feet away, but when she estimated the distance in relation to objects in the courtroom, the court stated that the distance was more like ten feet. This was the distance that Futrell specified in her trial testimony.

3. The portion of the videotaped exchange concerning appellant's drug use was as follows:
 DETECTIVE: ... Any of the girls that hang around over there on Eastern Avenue, the prostitutes or just the pick-up girls or whatever you want to call them, the crack heads, do you ever have any relationships with any of them?
 APPELLANT: No.
 DETECTIVE: Never any of them?
 APPELLANT: No.
 DETECTIVE: Do you ever share any drugs with any girls?
 APPELLANT: I had, before I moved up to Maryland Avenue, but since I went back to my sister's house, no.
 DETECTIVE: And, but, you told me before that you never actually like bought crack for a girl in exchange for sex or anything like that, right?
 APPELLANT: I didn't tell you that.
 DETECTIVE: You have done that then?

 APPELLANT: I have, you know.... Changing over for sex? Yeah, well, we sit down, we have, you know, smoke a little bit, something like that. But just buying and giving it to her and then she.... No, I didn't do no ... I didn't do that.
 DETECTIVE: But you have....
 APPELLANT: Me and a couple guys and a couple girls sit around, we smoke the crack, you know, have a little sex, whatever.
 DETECTIVE: Has anybody, have you ever had any confrontations with girls where you expected that to happen and then they decided not to give you sex?
 APPELLANT: No.
 DETECTIVE: That's never happened?
 APPELLANT: No.
 DETECTIVE: Ever?
 APPELLANT: No.
 DETECTIVE: If somebody were to come in here and say that that has happened, they'd be lying?
 APPELLANT: That's right.

4. Spriggs was in the initial photo spread that police showed to Baxter. While Baxter did not positively identify any photos in that array, she did apparently say that some of the photos resembled Mobley's assailant.

dealer also testified that shortly before Mobley's death, he had sold drugs to a tall, thin, brown-skinned, clean-shaven man with short hair. At trial, the dealer identified a photo of Spriggs as this buyer. Later, according to the dealer, the same man reappeared in the neighborhood and said, "I don't know who's going around who said I killed this girl but I know you all better shut up."

## II.

 The admission of evidence of a defendant's other crimes may create a significant danger: it may lead a jury to forego careful analysis of the evidence relevant to the charged offense and to convict simply on the basis of the inference that the defendant is a habitual criminal who is likely to have committed the charged offense because he or she has committed other crimes. *See, e.g., Thompson v. United States*, 546 A.2d 414, 419 (D.C.1988); *Drew*, 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90. Consequently, "once evidence of prior crimes reaches the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk." *United States v. Daniels*, 248 U.S.App.D.C. 198, 205, 770 F.2d 1111, 1118 (1985) (internal quotation marks and citations omitted) *cited in Thompson*, 546 A.2d at 419. For this reason, it has long been the rule in this jurisdiction that evidence of a defendant's other crimes is presumptively inadmissible, with the burden on the prosecutor to rebut this presumption. *Thompson*, 546 A.2d at 419 (citing *Drew* [, 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90] ).

 Evidence of a defendant's other crimes may, nonetheless, be admitted when it is relevant to one of the five exceptions set forth in *Drew*: motive, intent, absence of mistake, common scheme, or identity.[5] *Id.* at 420 (citing *Drew*, 118 U.S.App.D.C. at 16, 331 F.2d at 90)). The government's mere incantation of one or more of these

exceptions, however, will not function by itself as the "open sesame" that allows in other crimes evidence. "[C]ourts must view with a jaundiced eye evidence purportedly offered as relevant to some other issue but in reality bearing wholly or primarily on the defendant's predisposition to commit another ... crime." *Id.* (citation omitted). More particularly, in order for the trial court to admit other crimes evidence under one of the *Drew* exceptions,

(1) there must be clear and convincing evidence that the defendant committed the other offense; (2) the other crimes evidence must be directed to a genuine, material and contested issue in the case; (3) the evidence must be logically relevant to prove this issue for a reason other than its power to demonstrate criminal propensity; and (4) the evidence must be more probative than prejudicial.

*Roper v. United States*, 564 A.2d 726, 731 (D.C.1989) (citations omitted). While decisions about the admission of other crimes evidence are committed to the sound discretion of the trial court, *Daniels v. United States*, 613 A.2d 342, 347 (D.C.1992), the court must exercise its discretion in accord with these rules, and the record must reveal a sufficient evidentiary basis for the court's decision, *see generally Johnson v. United States*, 398 A.2d 354, 364–65 (D.C. 1979).

With this background in mind, we turn to the specific items of evidence that appellant contests.

## III.

Before trial, appellant's counsel moved to redact the portion of the videotaped statement in which appellant admitted that he had occasionally shared drugs with women, followed by sex. The government did not contest appellant's characterization of this statement as other crimes evidence. The government argued, however, that the statement would serve to explain appellant's alleged remark to Boddie that he had stabbed somebody "because she didn't do

---

5. The *Drew* court pointed out that this list is not necessarily exhaustive and that evidence of other crimes may also be used for purposes of impeachment in certain situations. 118 U.S.App.D.C. at 16 n. 10, 331 F.2d at 90 n. 10.

what she was supposed to do." The government's theory of the case was that appellant had agreed to share drugs with Mobley in exchange for sex and that he had killed her because she had failed to carry out her side of the bargain.[6] Thus, the government asserted, the statement was properly admissible to show appellant's motive for the murder and, consequently, his identity as the murderer. The trial court agreed and admitted this portion of the videotape under the *Drew* exceptions for motive and identity evidence.

■ We have recognized that "[m]otive evidence may ... help to establish the identity of the defendant" as the perpetrator of the offense charged. *Hill v. United States*, 600 A.2d 58, 61 (D.C.1991). Thus, other crimes evidence may be admitted to show the defendant's motive, even though motive is not an element of the offense charged or a contested issue, where identity is a contested issue and evidence of motive may help to prove identity. *See Hazel v. United States*, 599 A.2d 38, 41–42 (D.C.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 374, 121 L.Ed.2d 286 (1992); *Green v. United States*, 580 A.2d 1325, 1328 (D.C. 1990). However, where motive evidence is proffered to prove identity, the trial court must take care to verify that the evidence is actually specific enough to aid in differentiating the defendant from other possible suspects. *See* 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5240, at 483 (1978).

■ When motive evidence is offered to show identity, its probative value decreases insofar as the motive attributed to the defendant is either (a) so common that it embraces a large class of other possible suspects or (b) so generalized that it embraces a large class of potential victims. Thus, the court first should consider the extent to which the suggested motive is particular to the defendant.

If the defendant is the only person so motivated, the evidence can be strong; e.g.[,] the desire of a criminal for revenge against those who testified against him. But where the motive is one shared with many others with opportunity to have committed the crime, prejudice is often thought to outweigh probative worth; for example, proof that defendant is an addict offered to show a motive for a burglary.

*Id.* at 483–84 (footnotes omitted). The court next should review whether the motive attributed to the defendant especially concerns the victim of the crime charged. "The prosecutor's case for admissibility is strongest when the sole object of the hostility is the victim.... [C]ourts have also admitted evidence of acts evidencing hostility against a class which included the victim." EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 3:18, at 3–46 (1984) (footnotes omitted). But where the suggested motive relates only to a broad class of possible victims, it may be of little value in showing that the defendant committed a particular act against a particular victim. *Cf. People v. Lampkin*, 98 Ill.2d 418, 75 Ill.Dec. 260, 265, 457 N.E.2d 50, 55 (1983) (holding inadmissible defendant's broad threat against white state troopers, in trial for murder of three white men, two of them police officers, because the statement was "so general and impersonal that it [could not] reasonably be characterized as being directed towards anyone in particular"). The more common or generalized the motive evidence, the more it verges upon inadmissibility as mere propensity evidence.

■ Where the proffered motive evidence consists of uncharged conduct that in some way involved the victim of the charged offense, this evidence clearly helps to distinguish the defendant from other possible suspects and suggests that the defendant's motive is focussed particularly

---

6. The government also planned to present testimony from Boddie that he understood this to be the meaning of appellant's remark to him. The trial court excluded this evidence as too speculative, given Boddie's grand jury testimony that

on the victim.[7] Thus, in *Hill* we concluded that, in a trial for the murder of the defendant's girl friend, there was no error in the admission of evidence of the defendant's prior assault on the decedent. We upheld the admission of similar evidence in similar circumstances in *Green.* Again, in *Hazel,* we concluded that evidence of the defendant's prior attacks on the victim and of his involvement in a drug operation with the victim was admissible in defendant's trial for assault with intent to kill the same victim. And in *Yelverton v. United States,* 606 A.2d 181, 182–83 (D.C.1992), we held that evidence of a drug debt owed to the defendant by the victim had been properly admitted to show the defendant's motive and identity.

■ The circumstances of this case are very different, however, from those in *Hill, Green, Hazel,* and *Yelverton.* Here, there was no evidence, apart from the alleged remark to Boddie (that appellant had stabbed somebody "because she didn't do what she was supposed to do"), that linked appellant's sharing of drugs for sex to the victim in any way. Not only was there no proof that appellant had ever shared drugs with Faith Mobley in exchange for sex, but there was no evidence that appellant had had any kind of relationship with Mobley or even knew her. Nor was there any evidence concerning Mobley's sexual activity or possible usage of illegal drugs. In short, the proffered motive evidence provided no proof that Mobley had been a member of a class that had been involved with appellant in any way. Thus, even accepting the government's motive theory, its evidence utterly failed to show why Mobley would have been a likely victim for appellant.

Furthermore, the government's motive theory was itself highly speculative, since there was no evidence that appellant had ever threatened any woman for refusing his sexual advances after he had shared drugs with her. Indeed, appellant's admission that he had shared drugs for sex did nothing to distinguish him from any other person in the neighborhood who had done the same. This admission, therefore, offered little reason to believe that appellant in particular had a reason to murder Mobley.

Nor was the weak probative value of appellant's admission that he had shared drugs for sex significantly strengthened by the government's attempt to use it in explaining appellant's alleged remark to Boddie (that he had stabbed somebody "because she didn't do what she was supposed to do"). We recognize, of course, that the probative value of individual items of circumstantial evidence must be analyzed in context, rather than in isolation; "the common objection that the inference for which the fact is offered 'does not necessarily follow' ... poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall." Edward W. Cleary, McCormick on Evidence § 185, at 543 (3d ed. 1984), *quoted in Poulnot v. District of Columbia,* 608 A.2d 134, 140 (D.C.1992). In this case, however, the government simply did not have enough bricks to bridge the considerable gap between appellant's admission of drug use and his alleged remark to Boddie. In order to make such a connection, a jury would have to presume, *without a shred of evidence,* that Mobley knew appellant, that she used illegal drugs sometime before her death, and that she had obtained these drugs from appellant in exchange for a promise of sex and then reneged on the promise.

In sum, the government's motive theory rested on an extremely fragile foundation

---

appellant had not explained the remark in any way.

**7.** This is not to say, of course, that proof of the same victim's involvement in the uncharged offense is necessarily required any time that other crimes evidence is proffered to prove identity by showing motive. Such a test for admissibility is irrelevant, for instance, in situations where nei-

ther the offense charged nor the proffered other crimes evidence directly involve another human victim. *See Bigelow v. United States,* 498 A.2d 210, 213–14 (D.C.1985) (assuming that evidence that defendant was carrying a large amount of cash constituted evidence of another crime (drug dealing), it was nevertheless admissible to prove motive and identity).

and did little to distinguish appellant from other possible suspects. Given the especially inflammatory nature of evidence of illegal drug use,[8] in addition to the general prejudice that flows from any other crimes evidence, the prejudicial effect of appellant's admission unquestionably outweighed any probative value it may have had. Accordingly, we conclude that the trial court erred in admitting this evidence.

## IV.

The government also relied on the *Drew* identity exception in proffering Rose Futrell's testimony concerning appellant's alleged assault upon her two nights after Mobley's murder. Despite defense counsel's objections, the trial court admitted this evidence, finding that it bore sufficient indicia of a signature crime: "the same [kind of] victim, the knife, the same neighborhood, the knife being the same type of weapon."

██ As noted above, it is a basic prerequisite to the admission of other crimes evidence under any of the *Drew* exceptions that there be "clear and convincing evidence that the defendant committed the other offense." *Roper,* 564 A.2d at 731 (citations omitted). In order to satisfy this test, the trial court must find, by clear and convincing evidence, not only that the defendant was involved in the other offense but also that a crime actually occurred. *See id.; Groves v. United States,* 564 A.2d 372, 375 (D.C.1989), *modified on other grounds,* 574 A.2d 265 (D.C.1990); *cf. Hud-*

*dleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988) (under Fed.R.Evid. 404(b), "similar act evidence is relevant only if the jury can reasonably conclude that the act occurred"; thus, in prosecution for selling stolen videocassettes, evidence that defendant had earlier sold televisions at an inordinately low price was relevant only if a jury could reasonably find that the televisions had been stolen).[9]

██ In this case, the prosecutor effectively alleged in closing argument that appellant had assaulted Futrell with a dangerous weapon.[10] Yet the government acknowledges in its brief that there was no evidence that appellant ever moved toward Futrell or overtly threatened her in any way. Indeed, according to Futrell, appellant remained ten feet away from the van on the passenger side, while she was inside the van on the driver's side. Furthermore, given the fact that Futrell could not see the contents of the bag held by appellant, there was little basis for her conjecture that the bag held a knife. While the pointing of a dangerous weapon at a person may be sufficient to support a conviction for an "intent-to-frighten" type of assault, *see Robinson v. United States,* 506 A.2d 572, 574–75 (D.C.1986), Futrell's testimony was far too ambiguous to support a finding of clear and convincing evidence that appellant had committed an assault with a dangerous weapon. Accordingly, Futrell's testimony was not admissible as other crimes evidence, and the trial court's contrary determination was erroneous.[11]

8. *See Lyons v. United States,* 622 A.2d 34, 43–44 (D.C.1993); *Durant v. United States,* 551 A.2d 1318, 1329 (D.C.1988); *Rogers v. United States,* 419 A.2d 977, 981 (D.C.1980).

9. In *Huddleston,* the Supreme Court held that, where the relevance of evidence of another crime depends upon a conditional fact, the trial court need only determine "whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence" in order to satisfy the requirements of Fed.R.Evid. 404(b) and 104(b). *Id.* 485 U.S. at 690, 108 S.Ct. at 1501. In this jurisdiction, however, we continue to follow the clear and convincing evidence test. *See Lewis v. United States,* 567 A.2d 1326, 1331 & n. 10 (D.C.1989); *Groves,* 564 A.2d at 375 & n. 5; *see generally In re D.M.C.,* 503 A.2d 1280, .

1283 & n. 5 (D.C.1986) (Federal Rules of Evidence, as a whole, do not apply in District of Columbia courts, although individual federal rules have sometimes been adopted as setting forth evidentiary law of the District of Columbia).

10. Specifically, the prosecutor asserted that "two days after the homicide [appellant was] standing in the area with a butcher knife menacing, threatening another woman during the early morning hours."

11. Having reached this conclusion, we need not consider further whether "'the facts surrounding the two ... crimes ... show that there is a reasonable probability that the same person committed both crimes due to the concurrence

As an alternative ground for upholding the admission of Futrell's testimony, the government argues, citing *Wheeler v. United States*, 470 A.2d 761 (D.C.1983), that the incident described by her was not sufficiently criminal in nature to be subjected to *Drew*'s strictures and could have been admitted as generally relevant.[12] In *Wheeler*, we held that evidence that over a three-month period in a particular neighborhood the defendant had rung doorbells, peered into windows, wandered between houses and bushes, posed as a salesman and workman, followed one woman, and given an alias to a police officer, was not sufficiently criminal to trigger *Drew* analysis. *Id.* at 770. We went on to uphold the admissibility of this circumstantial evidence on the ground that it was generally relevant in a trial for a series of burglaries, robberies, and sexual attacks that had taken place in homes in the same neighborhood during the same time period, because it showed the defendant's presence in the neighborhood during the relevant period

and corroborated the direct evidence against him. *Id.* & nn. 37 & 38.

 In this case, however, the government has failed to specify what possible relevance Futrell's testimony could have had if the incident she described was not criminal in nature. *See Roper*, 564 A.2d at 731 ("if no crime was committed, evidence of the other offense would have no relevance—and at the same time, might seriously prejudice the defendant"). In essence, Futrell's testimony established, at most, that appellant had stood near her van shortly before midnight, staring at her and holding a dark-handled object, covered by a bag, in the direction of the van. Such evidence was not needed to show appellant's presence in the neighborhood, which was already clear. But neither was it particularly probative of anything more.[13]

More importantly, in this case, unlike *Wheeler*, the government clearly presented Futrell's testimony to the jury as evidence of another crime. *See supra* note 10. Thus, even if Futrell's testimony might

of unusual and distinctive facts relating to the manner in which the crimes were committed...." *Easton v. United States*, 533 A.2d 904, 907 (D.C.1987) (quoting *Drew*, 118 U.S.App.D.C. at 16, 331 F.2d at 90). It is worth noting, however, that there is little support for one of the key points of similarity argued by the government: that both crimes involved a butcher knife. Not only did Futrell have little basis for conjecturing that appellant was holding a butcher knife but also there was some question as to whether such a knife could have produced Mobley's wounds, because the medical examiner believed they were inflicted by a knife that was double-edged along at least a portion of the blade. Furthermore, Futrell did not know appellant. Thus, the motive for the supposed assault on her could not have been the same as that suggested by the government for Mobley's murder. Finally, for the reasons given above, the alleged assault on Futrell was so incomplete as to make any comparison between it and the attack on Mobley essentially speculative.

**12.** It is not clear that the government made this argument to the trial court. However, since the trial court appears to have considered this contention at least indirectly in the course of its discussion with counsel, we will not deem it waived.

**13.** Conceivably, one could argue that Futrell's testimony was relevant as evidence of appel-

lant's possession of the murder weapon. In the absence of a specific trial court finding on this issue, however, we are reluctant to say that Futrell's testimony would have been admissible for this purpose. Granted, Boddie claimed to have seen appellant with a butcher knife on the morning of Mobley's murder. But Futrell's testimony regarding appellant's possession of a butcher knife was essentially unfounded; it is questionable whether a butcher knife was even used in Mobley's murder, *see supra* note 11; and no murder weapon was ever produced. On this record, we cannot properly find on our own that Futrell's testimony linked appellant sufficiently to the instrumentality of the crime to be relevant for this purpose. *Compare Burleson v. United States*, 306 A.2d 659 (D.C.1973) (trial court erred in admitting in evidence gun found in defendant's brother's car five hours after alleged assault with a dangerous weapon, where no other evidence linked defendant with this gun, apart from complainant's testimony that it appeared to be the same gun used in alleged assault) *with Ali v. United States*, 581 A.2d 368, 374–75 (D.C.1990) (no error in admission of evidence that defendant possessed shotgun similar to that used in killing, where witness had seen defendant place shotgun in a bag, appellant was seen carrying similar bag the night of the murder, and witness saw ammunition similar to that found at the scene of the crime), *cert. denied*, ―― U.S. ――, 112 S.Ct. 259, 116 L.Ed.2d 213 (1991).

have been admissible on grounds of general relevance, the actual use of this testimony at trial rendered it more prejudicial than probative. Under these circumstances, it would be fundamentally unfair to appellant, who suffered all the prejudice inherent in the use of other crimes evidence, to uphold retroactively the admission of Futrell's testimony for another, more limited purpose that would have precluded the government from making an other crimes argument. *See Williams v. United States,* 549 A.2d 328, 332 (D.C.1988) (government could not rely on *Wheeler* where prosecutor's questions and witnesses' testimony would have led a reasonable juror to believe that the contested evidence was evidence of another crime).

### V.

Having thus concluded that the trial court erred in admitting both Futrell's testimony and appellant's statement about his drug use, we must determine whether these errors are "of a magnitude to require reversal." *Johnson,* 398 A.2d at 366 (emphasis omitted). In this case, where defense counsel preserved these issues before the trial court but does not allege any constitutional violations, the appropriate test for reversible error is the standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). *See White v. United States,* 613 A.2d 869, 874 (D.C.1992) (en banc). Thus, we must decide whether we can " 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgement was not substantially swayed by the error.' " *Id.* (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248). Under this standard "we must find it 'highly probable that [that] error did not contribute to the verdict.' " *Clark v. United States,* 593 A.2d 186, 192 (D.C.1991) (quoting *United States v. Tussa,* 816 F.2d 58, 67 (2d Cir. 1987)).

█ The government's incriminating evidence in this case was not insignificant. Baxter identified appellant as the man she saw following Mobley shortly before the

murder. Boddie testified that appellant had confessed to stabbing someone on that same morning. Apart from the testimony of Baxter and Boddie, however, there was no other evidence that connected appellant with the murder, and the testimony of both of these witnesses was open to doubt.

Baxter admitted that other possible suspects in the photo arrays also resembled the person she had seen. Moreover, Baxter's initial description of the man she had seen was not entirely consistent with her identification of appellant. Indeed, her description of the murderer may have better fit Spriggs, whom witnesses had seen playing with a knife in the neighborhood on the morning of Mobley's murder, and who was alleged to have issued a general threat against anyone who might connect him with Mobley's murder.

As for Boddie, his drinking and use of PCP throughout the night preceding Mobley's murder, as well as his fear of prosecution for this or other crimes, damaged his credibility. Furthermore, Boddie's testimony that the butcher knife displayed by appellant was entirely blunt on one side and that he saw no blood on either the knife or appellant was not entirely consistent with the evidence that Mobley's wounds bled profusely and had been inflicted by a weapon that was double-edged on at least some portion of the blade.

Under these circumstances, we cannot say it was "highly probable" that the jury did not rely on Futrell's testimony and on appellant's admission of drug use as crutches to support its decision to convict appellant. Accordingly, we must conclude that the trial court's admission of this evidence was not harmless error and thus constituted an abuse of discretion. Appellant's convictions are therefore reversed, and the case is remanded for a new trial.

*So ordered.*

TERRY, Associate Judge, concurring:

I readily join my colleagues in voting to reverse the conviction, and I join also in most of Judge Ferren's opinion for the court, especially part IV. But I have some

reservations about part III, in which I concur only as to the result.

I see no need to go into such a lengthy discussion of the nuances of the motive exception under *Drew*.[1] For me it would be sufficient simply to say that appellant's videotaped statement that he had engaged in drugs-for-sex liaisons with other women had absolutely no probative value, either under *Drew* or on any other theory, and that its admission was not harmless because it was so inflammatory. It is utter speculation to say, as the government does, that this statement "explains" what appellant meant when he said to Boddie that he had stabbed a woman "because she didn't do what she was supposed to do." Once the trial judge excluded Boddie's testimony about what he thought appellant meant (a ruling which was plainly correct), the drugs-for-sex statement had to be excluded also because there was no demonstrable connection between it and the "supposed to do" remark. It obviously does not establish appellant's motive in the same manner as the challenged evidence in *Hill v. United States*, 600 A.2d 58 (D.C.1991).[2] Although the government is correct in arguing that a situation like that in *Hill* is not the only one in which *Drew*-type evidence is admissible to establish motive, I do not see any other acceptable rationale here for admitting the drugs-for-sex statement. That, I think, is all that we need to say.

---

1. *Drew v. United States*, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964).

2. In *Hill* the defendant was charged with the murder of his former girl friend on September 4. Evidence that he had had a violent argument with her on May 19 was admitted under the motive exception recognized in *Drew*. We held that evidence of the argument in May, and of the hostile relationship that led to it, was admissible to prove that the defendant had a motive to kill the victim in September. "[T]he admissibility of evidence such as that at issue here depends on the identity of the parties, *i.e.*, on the fact that the defendant had a motive to harm this particular victim, with whom he already had an established relationship." 600 A.2d at 62 (citations omitted).