Saul A. LAZO, Appellant,

v.

UNITED STATES, Appellee.

No. 05–CF–558.

District of Columbia Court of Appeals.

Argued March 20, 2007.
Decided Aug. 2, 2007.

---

Sharad Khandelwal, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time, and Roy W. McLeese III, Elizabeth Trosman and Youli Lee, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and FARRELL and RUIZ, Associate Judges.

FARRELL, Associate Judge:

Appellant was found guilty by a jury of assault with intent to kill while armed, aggravated assault while armed, and carrying a dangerous weapon outside the home or place of business. Evidence permitted the jury to find beyond a reasonable doubt that appellant was one of a group of persons who, believing that the victim, Miguel Garay, was a member of a particular gang, chased him into a barbershop where appellant repeatedly stabbed him with an object resembling a screwdriver. A patron of the barbershop pointed out appellant to nearby police as he fled the scene moments later; they caught him

and returned him to the shop, where he was identified by two patrons—one from his clothing, the other from his full appearance—as the man wearing a blue, hooded shirt or windbreaker who had stabbed Garay.

On appeal, Lazo raises several grounds for reversal of his convictions, none of which, we conclude, warrants that relief. We remand for correction of his sentence.

## I.

At trial, the judge allowed Miguel Garay to testify, over objection, that shortly before the assault he had passed near a group of some ten people on the street corner, one of whom asked him "if [he] was V.L.," which Garay understood to mean "Vocos Locos, ... the name of a gang." When Garay ignored the question, the group began chasing him. He ran into the barbershop for refuge, but several men followed him in and assaulted him; during the assault he heard a young woman yell, "[S]top, ... leave him alone, he's not in the gang, he's not in the gang."

Appellant contends that these references to "Vocos Locos" and a "gang" were not relevant to any issue in the case—they were "not required to prove any element of the [charged] offenses" (Br. for App. at 15)—and served only to inflame the passions of jurors perhaps too familiar with gang activity. He is mistaken. The limited references to a gang by Garay "suppl[ied]" to the jury a motive for an otherwise unexplained [stabbing]," *Plummer v. United States*, 813 A.2d 182, 189 (D.C.2002), and thus were relevant to appellant's identity as one of the assailants. Specifically, of the universe of persons who hypothetically might have had a motive to assault Garay, the brief references to "Vocos Locos" enabled the jury to narrow that class to persons from among the group that had identified him with a gang they

evidently disliked, and who had chased him into the shop for that reason. Garay himself did not link appellant directly to the stabbing: he did not know him and could not identify him (or anyone) as his assailant. The direct identification evidence came from the two barbershop patrons who observed the stabbing, saw appellant flee, and identified him when he was returned to the shop by the police. The relevance of the motive evidence, by contrast, lay in countering the argument a competent defense attorney surely would have made in its absence that reasonable doubt existed because no reason had been shown for appellant to assault Garay. The references to "Vocos Locos," in short, provided circumstantial evidence of appellant's identity, because it is hornbook law that "[t]he presence or absence of a motive on the part of the defendant which might tend to commission of ... a [criminal] deed may always be considered by the jury on the question of whether he did commit it." ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 928 (3d ed.1982).

The test for relevance is a minimal one; evidence is relevant if it has "any tendency to make the existence of any fact ... of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Street v. United States*, 602 A.2d 141, 143 (D.C.1992). Here the motive evidence undeniably had some "tendency" to make appellant's identity as the stabber more probable than it otherwise would have been, by "supply[ing] ... a motive for an otherwise unexplained [assault]." *Plummer, supra.*

Beyond determining relevance, the trial judge was obliged to balance the probative value of the gang references against their potential for prejudice. *See, e.g., Plummer*, 813 A.2d at 189. The judge carefully did so, recognizing the probative value of

the motive evidence but also the potential prejudice to a defendant from any reference to gang activity or affiliation. The judge, therefore, strictly limited testimony on the subject to the few matters described above, at one point admonishing the prosecutor that "we are not going to be talking about any gang activity." There was no abuse of discretion in this careful balancing. *See, e.g., Freeman v. United States,* 689 A.2d 575, 580 (D.C. 1997). And, it goes without saying, we reject appellant's reliance on those decisions that have condemned mention of gang membership where, in the circumstances, it created a "significant danger that conviction rested merely on guilt by association." *Id.* at 582 (discussing such cases). The references to "Vocos Locos" were only one piece of the mosaic of evidence strongly demonstrating appellant's guilt.

Our dissenting colleague asserts that only "[i]f there had been evidence presented that appellant was a member of a gang . . . would [we] be correct in stating that the gang references were probative." *Post* at 188. This oddly implies that only overtly prejudicial evidence of his gang membership—evidence the trial judge might well have excluded as more prejudicial than probative—would have sufficed to meet minimal standards of relevance. In fact, though, it was not important whether appellant belonged to a gang or not; what mattered was that, by reasonable inference, he was part of the group of persons who accosted Garay believing (mistakenly, it appears) that *he* was a member of a gang they disliked, and who therefore chased him into the barbershop where one or more of them assaulted and stabbed him. That evidence—*Toliver* evidence, if you will [1]—of the circumstances surrounding a stabbing linked to appellant by two eyewitnesses explained an action that otherwise would have been argued to be motiveless on his part and thus open to reasonable doubt on identification. The proof of why Garay was assaulted was an inextricable aspect of the picture the jury was entitled to see, introduced in minimally inflammatory fashion. There was no error.

## II.

■ Appellant next argues that testimony by the barbershop patrons reporting statements by Garay as he sought refuge in the shop should not have been allowed because the requirements of the excited utterance exception to the hearsay rule were not met. To the contrary, an adequate foundation existed for the trial judge's conclusion that the statements— chiefly Garay's exclamation "they're after me, they're after me" as he entered the shop—met the requirements of shock or nervous excitement and spontaneity for admission of a statement as an excited utterance. *See generally Bryant v. United States,* 859 A.2d 1093, 1106 (D.C.2004); *Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977).

■ Further, the judge did not err, and certainly not reversibly, when he suggested to defense counsel in the jury's presence that "[w]e will have to . . . try to pare down" the number of witnesses counsel had declared his intention to call. Even if, as appellant argues, the jury should not have heard this implied "criticism . . . of the number of potential defense witnesses and the quality of their testimony" (Br. for App. at 27), any resultant prejudice was too slight to warrant reversal. *See Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

---

1. *See Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983).

■ Appellant contends, additionally, that the judge erred in permitting the prosecutor to remark upon appellant's change of appearance in closing argument by twice comparing it to his flight from the scene of the assault, as in: "He fled on foot. He's fleeing with the change of his appearance, or at least he's trying to." The basis for the prosecutor's change of appearance argument, see CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.46 (4th ed.2001), was the testimony of the arresting officers and photographic evidence indicating that appellant had greatly shortened his_ hair between the time of arrest and trial. When supported by the evidence, we have recognized the legitimacy of such argument. *See Scott v. United States,* 619 A.2d 917, 928 (D.C. 1993); *see also United States v. Carr,* 362 U.S.App. D.C. 303, 306, 373 F.3d 1350, 1353 (2004) ("Because there was independent evidence indicating that the defendant ... changed his appearance, the jury could reasonably infer that he did so in order to avoid identification at trial and thereby evinced [a] consciousness of guilt.") (ellipses and brackets in original; internal quotation marks and citations omitted). Even if, as appellant argues, the prosecutor overstepped proper limits when he asserted that "Mr. Lazo was running again when he changed his appearance ... *[a]nd [he has] been running throughout this trial.* Do not let [him] get away" (emphasis added), the trial judge immediately cautioned the jury that "if you think a lawyer expressed an opinion during argument, disregard the personal opinion and judge this case only on evidence produced in this courtroom." Again, any prejudice from the prosecutor's over-zealous rhetoric was insufficient to justify reversal. *Kotteakos, supra.*

■ Finally, appellant faults the judge for overruling his objection to the prosecutor's remarks about a mask that one eyewitness claimed to have seen him wear. The two barbershop patrons had given conflicting testimony as to whether appellant wore a mask at the time of the stabbing. After defense counsel remarked on the discrepancy about the mask evidence in summation and added, "You don't see a mask in evidence. No mask was recovered from my client after his arrest," the prosecutor countered: "Why is it that there is this discrepancy, this inconsistency with regard to the mask. The answer is we don't know. Where did the mask go? I don't know. The defense hasn't told you and you don't have any witnesses who have told you that ... You shouldn't speculate about that." Contrary to appellant's argument, the prosecutor did not shift the burden of proof here by acknowledging the discrepancy in the government's own evidence and then telling the jurors not to "speculate" about what had become of the mask. *See Coleman v. United States,* 515 A.2d 439, 450 (D.C. 1986) (prosecutor may respond in rebuttal to defense counsel's assertions).

### III.

The government agrees that appellant's five-year prison sentence for carrying a dangerous weapon (CDW) was improper. By operation of D.C.Code § 24–403.01 (2006 Supp.), the maximum prison sentence for (unenhanced) CDW is three years. Except for the remand we order to effect that correction, the judgment of conviction is

*Affirmed.*

RUIZ, Associate Judge, dissenting:

I disagree with the majority's conclusion that the gang references were probative of any material issue in this case because they had no factual basis, and I dissent because, viewed in the context of the case

as a whole, their wrongful admission could have inflamed or confused the jury to convict appellant.

The majority states that because the references provided a motive for the stabbing, they "thus were relevant to appellant's identity as one of the assailants," reasoning that "of the universe of persons who hypothetically might have had a motive to assault Garay, the brief references to 'Vocos Locos' enabled the jury to narrow that *class of persons from among the group that had identified him with a gang they evidently disliked,* and who had chased him into the shop for that reason." See *ante* at 185 (emphasis added).

This explanation of logical relevancy, however, cannot withstand analytic scrutiny. The relevance of the victim's purported gang affiliation is what it says about the assailants—that they had a motive triggered by what they mistakenly believed was Garay's membership in the "Vocos Locos" gang. Therefore, the only way that the gang references could have narrowed down the "class of persons from among the group" responsible for the attack to include appellant is if there had been evidence presented to the jury that identified him as one of "the[m] who evidently disliked" the "V.L." gang. This is obviously a reference to a rival gang.[1] The government readily admits, however, that "there was no testimony presented that appellant ... was affiliated with V.L. ["Vocos Locos" or "Vatos Locos"] or any other gang." As a result, although the

gang testimony elucidated the motive behind the assault, it did not make it more likely that appellant was, in fact, one of the persons who participated in the attack. If there had been evidence presented that appellant was a member of a gang, then the majority would be correct in stating that the gang references were probative, because the jury could infer that a member of a gang is more likely to stab a member of a rival gang over a gang feud than a person not so affiliated.[2] Indeed, in this case, a witness to the stabbing tried to stop it by crying out at the time that the victim, Garay, was not a member of the gang that was a rival of the gang with which the stabber was presumably affiliated. Without any evidence that appellant was a member of that gang—or of any gang for that matter—the majority's reasoning has no factual grounding. Because the gang references did not provide circumstantial evidence that identified appellant as an assailant and were not relevant to any other material issue, it was error for the trial judge to admit them. *See Mercer v. United States,* 724 A.2d 1176, 1184 (D.C.1999) ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case."); *cf. United States v. Abel,* 469 U.S. 45, 49, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (noting as relevant to witness's bias evidence that defendant and a defense witness were members of the same gang).

1. Surely not every person who "dislikes" gangs and gang violence is among the group of possible assailants.

2. The trial judge would have to exercise discretion with respect to the presentation of evidence of appellant's gang membership, including limiting instructions, in order to avoid undue prejudice. But relevance must be based on evidence presented to the jury, not conjecture or untested assumptions. If the jury is to be asked to find a defendant guilty, at least in part, based on the assailant's motive, the connection between the motive and the defendant must be established. Therefore, the jury must be provided with evidence sufficient to enable it to evaluate whether there is a reasonable basis for the inferential chain—from gang membership, to motive, to identity and, ultimately, guilt.

The only contested issue in this case was identity, and references to the stabber's presumed gang membership did nothing to implicate appellant as the stabber. To the extent the government claims that the gang references were admissible to provide context, and in particular, to elucidate the motive for the stabbing, this argument defies the well-settled rule that requires the weighing of probative evidence against potential prejudice. *See Plummer v. United States*, 813 A.2d 182, 189 (D.C.2002) ("The weighing of probative value versus prejudice must always be part of the trial judge's consideration...."). Motive is not an element of any of the charges for which appellant was convicted, *see* D.C.Code §§ 22–401, –401.1, –4502, –4504(a), nor was it a contested issue at trial. *See Jones v. United States*, 625 A.2d 281, 284 (D.C.1993) ("[E]vidence is relevant if it makes the existence of a *contested fact* that is of consequence to the determination of the action more or less probable than it would be without that evidence.") (emphasis added); *see also Robinson v. United States*, 623 A.2d 1234, 1239 (D.C.1993) (noting that "other crimes evidence may be admitted to show the defendant's motive, even though motive is not an element of the offense charged or a contested issue, where identity is a contested issue *and evidence of motive may help to prove identity*") (emphasis added). We have recognized, however, that "[r]eferences to a gang feud can supply to the jury a motive for an otherwise unexplained killing," *Plummer*, 813 A.2d at 189, but the desire to "round out" the jury's overall understanding of the crime—to permit the prosecutor to present a compelling story— is secondary to ensuring that in considering whether *this defendant* committed the crime, the jury is not swayed by inflammatory evidence that is legally irrelevant to *his* guilt or innocence. Thus, "we have cautioned trial courts to consider carefully before admitting evidence of gang retaliation, and then only after ensuring that the government's evidence is relevant, necessary and supported by competent evidence." *Id.* For the reasons I now explain, weakness in the government's case made admission of this non-critical evidence of motive unduly prejudicial.

We review the erroneous admission of gang references under the harmless error standard enunciated in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which requires us to examine the prejudicial effect of the erroneously admitted evidence in relation to the strength of the government's case. *See Plummer*, 813 A.2d at 190. I begin my analysis with the premise that references to gangs are inherently prejudicial. *See id.* at 189. Indeed, as one court has noted, "[t]he word 'gang' ... connotes opprobrious implications ... [T]he word 'gang' takes on a sinister meaning when it is associated with activities." *People v. Albarran*, 149 Cal.App.4th 214, 223, 57 Cal. Rptr.3d 92, 99 (2007) (quoting *People v. Perez*, 114 Cal.App.3d 470, 479, 170 Cal. Rptr. 619, 623 (1981)); *see also State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) (noting that "evidence of gang membership and activity is inherently prejudicial"); *People v. Avitia*, 127 Cal.App.4th 185, 192, 24 Cal.Rptr.3d 887, 892 (2005) (describing gang testimony as "highly inflammatory" and cautioning trial courts to "carefully scrutinize such evidence before admitting it") (internal quotation marks and citations omitted); *People v. Davenport*, 301 Ill. App.3d 143, 234 Ill.Dec. 169, 702 N.E.2d 335, 341 (1998) (noting that "a deep and widespread public prejudice may exist against street gangs").[3]

---

3. The government devotes a footnote to harmless error. In that footnote, and notwith-

Although the majority characterizes the gang references as "brief" and "limited," see *ante* at 185, the record shows otherwise. The prosecutor began the gang theme during opening statement using the proxy phrase "blind, bloody, senseless rage." The jury was specifically made aware that the brutal assault was likely an act of gang violence when the victim, testified that, shortly before he was attacked, he was asked whether he was a member of the gang "V.L." As noted, the jury also heard testimony that, at the onset of the attack, a bystander yelled out "stop, stop … leave him alone, he's not in the gang, he's not in the gang," referring to the victim of the stabbing. At closing, the first words out of the prosecutor's mouth were:

> A burst of blind, bloody senseless rage. When we first met last week, that's what the government told you were going to hear about in the context of this case.

Three more times the prosecutor referred to the assault as a "burst of blind, bloody senseless rage" in the first two pages of his closing argument, and he continued to refer to the stabbing as "senseless rage" throughout closing argument. For example, at one point the prosecutor reminded the jury that the vicious assault was par for the course of gang violence:

> And [the victim] told you what the … question was, are you in a gang, and then the chase was on. And that's it. And if that makes sense, we don't have any other explanation for it. It's a senseless rage. It's a senseless rage … That's how determined, that's how blind, that's how senseless this rage was.

And the last words in the prosecutor's closing also sounded the gang theme:

> For no good reason. A burst of blind, bloody senseless rage that can only mean that these men are guilty of all of the charges. …

In this case—as distinct from *Plummer*, where this court concluded that the potential error in admitting testimony about gangs was harmless because "the evidence at trial of appellant's guilt was considerable," 813 A.2d at 190,—the gang references cannot be dismissed as inconsequential when considered in the context of a compelling government case. There were five testifying witnesses to the attack, each with his or her own version of the event, and virtually the only description they all shared in common was that the attack was quick and the scene chaotic. Three could not identify appellant at all, and the testimony of the two who identified appellant as the stabber could not be reconciled.

The victim, Garay, testified that he was walking from school to his friend's house when he passed a group consisting of approximately ten individuals, one of whom asked Garay if he was part of the "Vocos Locos" gang. Garay ignored the question and kept walking, but a few moments later he turned around and saw that he was being chased by some of the members of the group. Garay started running and then bolted into the barbershop for safeharbor because he knew friends were employed there. After he entered the shop, he said that a group was chasing him. While somebody was telling him to calm down, Garay "saw the bunch of group of people coming" to attack him. Garay did not, however, identify appellant as having been in the group that taunted him or chased him, and he testified that he did not see a person wearing a "blue hooded

standing the prosecutor's emphasis on gang violence during closing argument, on appeal the government makes the surprising claim that the jury was unlikely swayed by these gang references because there was no evidence tying appellant to a gang. This argument is either frivolous or disingenuous.

sweat shirt"—what appellant was wearing—when he passed the group on the street the first time or among the persons he saw *running into the barbershop* right before he was attacked. Garay testified that he did not get a good look at his assailants because by the time they entered they *all* were wearing masks and during the attack he was covering his face with his jacket to protect himself.

Alvin Elliot was getting a haircut when Garay ran into the barbershop. He testified that "a few seconds later," two or three persons arrived outside the store and peered inside. As they came in, an additional eight to twelve persons arrived outside the store. According to Elliot, of the three persons who entered the barbershop immediately after Garay, *only one* was wearing a mask. Elliot testified that another one of the three men—not the one wearing a mask—was wearing a blue-hooded jacket with the hood down (*i.e.*, not obscuring his head or face) and carrying "what looked like [a] screwdriver." Right after the first two or three persons entered the barbershop, approximately seven or eight of the persons who had been standing outside rushed into the shop—and "[i]t became a free for all."

According to Elliot, the "physical portion of the attack" lasted a mere ten to fifteen seconds during which the *un-masked* person with the screwdriver stabbed Garay approximately six times. During this brief time-frame, Elliot moved toward the barbershop's entrance and went out to the street. He turned around and saw that the attackers had stopped punching, kicking, and stabbing Garay and had "start[ed] coming out [of the barbershop]," such that there were "15 or 20 people" around the door. As they were leaving, Elliot saw a police officer, Officer Mark Jackson, who was patrolling the area, and yelled out to him that the "guy in the blue hood[y] and the blue jeans just stabbed somebody." Officer Jackson chased after the person Elliot had pointed out. Elliot admitted at trial that the person he pointed out to the officer left his "line of sight ... briefly" during the chase,[4] and Officer Jackson testified that he slipped and fell, but that another officer, Officer Jenkins, immediately "picked up the pursuit" and apprehended the running suspect, who was later identified as appellant.

After appellant was apprehended by Officer Jenkins, he was brought back to the barbershop for a show-up identification. Elliot participated in the show-up and was "very sure" that appellant was the stabber. Elliot also made an in-court identification of appellant.[5]

4. At trial, Officer Jackson testified that Elliot alerted him that a person wearing a blue-hooded jacket and blue jeans had just stabbed someone, and that he immediately chased after that person. According to Officer Jackson, he observed only one person running and only one person wearing a blue-hooded jacket and blue jeans. As he gave chase, he saw the suspect hand a "slender, metallic object ... to a group of individuals standing on the corner." (That object was not admitted into evidence.)

As discussed in the text, Officer Jackson's description of the scene was directly at odds with the testimony of one of the government's witnesses, Patricia Lanier, who testified that several people took off running when they saw Officer Jackson, as well as that of Henry White, one of the barbers working that day, who also testified that several people were running—not just the person wearing a hooded jacket.

5. Elliot's testimony was significantly impeached. Confronted with his testimony before the grand jury, he admitted that he had previously testified that only two persons came into the barbershop and began to attack Garay, as opposed to three as he testified at trial. Elliot also conceded that the three persons he saw coming into the shop to attack Garay were Hispanic men between the ages

Andre Lucas was seated in a barber's chair getting his hair cut when Garay ran into the barbershop asking for help. According to Lucas, after Garay entered the store, a group of three persons ran into the store and "jumped on him and started beating on him." As they were beating him, a fourth person, wearing dark clothing, a "ski mask," and a "hood over his head," entered the shop and "joined in with [the other three attackers]." It was this person—the one who was masked and hooded—whom Lucas observed making stabbing motions toward Garay's body. Lucas described the scene as "[m]ass confusion." He headed toward the door of the barbershop "to help, get the police," when four or five more persons entered the shop. Lucas testified that he did not know whether they also joined in the attack because he was leaving the barbershop. Lucas participated in the show-up identification after the assault but could not identify appellant as "having been in the barber shop"—let alone been the stabber—during the attack.

Patricia Lanier testified that she witnessed the attack and agreed that it happened "very quickly." According to Lanier, two men ran into the barbershop immediately after Garay arrived and started punching and kicking him. One of the two was wearing a "black mask that started under his eyes," and a "blue windbreaker with a hood . . . drawn very close around his face." Lanier testified that this person had a screwdriver and used it to stab Garay approximately six times. Meanwhile, yet another person ran into the store and yelled out to the attackers that Garay was not part of a gang. Five or six more persons arrived at the barbershop and from the doorway "cheer[ed] the[ ] [two attackers] on." Lanier participated in the show-up identification, and identified appellant as the stabber, but since the stabber's face was masked and obscured by the hood during the attack, she was only able to identify him because he was wearing "the same type of blue jacket, the same type of jeans[, and] his frame . . . was very similar to the [stabber's]." [6]

Finally, Henry White, the barber who was cutting Lucas's hair when Garay entered the barbershop, testified that after Garay entered, *ten* individuals bolted inside chasing him—and all ten participated in the attack. One person had a "blue jacket [and] a mask on," but more than

---

of 17–21 and that, from his perspective, they "all looked alike." Moreover, Detective Anthony Hector, a Metropolitan Police Department Investigator who had interviewed Elliot soon after the assault, testified that, during his interview, Elliot stated that the attacker had been wearing "a mask . . . [with a] hood on and it was tight around his face . . . [such that] *he could not see the face.*" (Emphasis added.) In addition, in conflict with Elliot's claim at trial that he saw a screwdriver with a "yellow handle," Detective Hector testified that Elliot had previously told him that the screwdriver had a "red handle." Led by the government's questions during cross-examination, Detective Hector reversed course and claimed that even though he conceded that his testimony on direct examination was *consistent* with sworn testimony he had given during the preliminary hearing in the case shortly after his investigation, he was "mistaken," and Elliot, in fact, did not previously state that the stabber was wearing a mask or that the screwdriver handle was red. Detective Hector offered no explanation as to how he could have been mistaken on such an important point as the mask, or how he caught his mistake between direct and cross-examination. Instead, the prosecutor suggested during closing argument that Detective Hector's police work had been "sloppy."

6. In contrast, the following week Lanier identified appellant's codefendant as "the young man who initiated the fight in the barbershop" upon looking at a photograph provided to her by Detective Hector. She also made an in-court identification of the codefendant.

one of the persons in the group was wearing a mask, "a couple of them had on hoodies ... covering their heads," and most of them were wearing "dark" clothing. White also testified that "everything happened so fast." According to White, when Officer Jackson arrived, everyone "scattered" and Officer Jackson "just chased the first person he seen running." White was not asked to participate in the show-up identification of appellant, and at trial he testified that he had never seen appellant before.

In sum, at the close of the evidence, the jury was left with various accounts of the details of the attack and—most important to the issue of identification—various descriptions of the person who stabbed Garay. The one constant was their description of the scene as involving a number of people who rushed in and then ran out in an extremely compressed period of time. Of the many eyewitness only five testified, and of these, two identified appellant as the one who stabbed Garay. Elliot, who testified that the stabber was not wearing a mask and that he was "very sure" that appellant was the stabber when he identified him at the show-up, was entirely inconsistent with the descriptions of Lanier and Lucas, who testified unequivocally that the stabber was wearing a mask and a hood that obscured his head and face. Moreover, Elliot's testimony was impeached with Detective Hector's (self-contradictory) testimony that Elliot had previously told him that the stabber was wearing a mask, thereby undermining Elliot's claim that he was "very sure" of his identification. Although it was the jury's province to credit Elliot's identification despite the impeachment and inconsistency with Lanier's and Lucas's description of the stabber, I cannot, on this record, say with "fair assurance," *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239, that the jury was not swayed to accept Elliot's identification in part because it had been inflamed by factually unsupported assertions that appellant was a gang member who visited the horrors of gang violence on Garay and the patrons of the barbershop.

On the other hand, if one assumes that the jury disregarded Elliot's flawed testimony and opted to convict on the basis of Lanier's identification of appellant at the show-up, her identification was too weak, given the surrounding circumstances and other evidence, to offset the substantial prejudicial impact of the gang references on the jury. Lanier was only able to identify appellant by his clothing and build, but, as White testified, several persons participating in the attack wore hooded jackets and dark apparel, and more than one was masked. Moreover, Lanier's description of appellant's attire, consisting of a blue hooded top and blue jeans, was not so unique so as to allay the very real risk of misidentification, based on what Lanier conceded—as did every other witness—was a brief observation of the stabber in a fast-paced and hectic scene. Indeed, Lanier's generic description of the stabber's apparel did not even precisely match appellant's attire when he was arrested because appellant's hood did not contain any white strings—which Lanier made clear were attached to the stabber's hood during the attack. Significantly, according to Officer Jackson, appellant left his line of sight only momentarily while he was chasing him, but appellant was not apprehended wearing a mask—nor did Officer Jackson, Elliot, or any other witness testify that they observed appellant dropping or handing off the mask Lanier and others said the stabber was wearing.

In this case, the testimony of the two witnesses who identified appellant was entirely contradictory on the material issue

of whether the stabber was masked,[7] and as such, the potential for prejudice resulting from erroneous admission of irrelevant and inflammatory evidence increased. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (identifying "contradicting ... testimony of ... witness[es] on material points" as an important factor in analyzing harmlessness). Although appellant was observed fleeing the scene (as did others) and handing a metallic object to a group of persons, there was no testimony that the object was recovered or that it was, in fact, the screwdriver that was used to perpetrate the assault. Finally, as the trial court instructed the jury, although relevant, under the law "flight alone does not imply guilt," *Smith v. United States*, 837 A.2d 87, 95 n. 5 (D.C.2003), but it says even less about appellant's guilt in the context of a confused scene where many people were running. Weighing the relatively weak identifications and lack of other evidence linking appellant to the stabbing against the highly prejudicial and factually unsupported references to appellant's gang membership in the prosecution's case and subsequent

exploitation of the jury's fear of gang violence throughout closing argument, this is not a case in which, "when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect [so that] the verdict and the judgment should stand." *Kotteakos*, 328 U.S. at 764, 66 S.Ct. 1239. I would remand for a new trial free of that prejudicial taint.

---

7. Not only were the conditions under which Elliot and Lanier observed the attack chaotic and their descriptions of the stabber contradictory, but the record suggests that appellant's appearance at the show-up also might have increased the risk of misidentification. Officer Dwayne Anderson, who arrived on the scene after appellant was apprehended by Officer Jenkins observed that appellant had "blood stains on his hands ... and blood on his shirt." The show-up was conducted, according to the government "within minutes of the attack," so it seems safe to assume that is how he was presented—bloodied and handcuffed—during the show-up. The presence of blood stains on appellant's hands and clothes, however, was either irrelevant, as the government urged in rebuttal, or was arguably exculpatory. Officer Jackson testified that appellant was "bleeding ... as a result of the injury sustained [when appellant was] tackle[d]," and was "spitting blood from his mouth" when he was apprehended. The

blood found on appellant's person and clothing was not analyzed to determine a match to Garay's blood. Garay testified that he was "losing a whole lot of blood", and in closing defense counsel argued that the absence of blood on the sleeves or "wrists or the cuff area" of the jacket appellant was wearing when he was apprehended made it unlikely that appellant was the stabber. In rebuttal, the prosecutor attempted to persuade the jury that the blood on appellant's jacket more likely came from appellant's own injury because Garay did not began to bleed significantly until after the attackers had left the scene. Regardless of the merits of the government's or the defendant's competing theories at trial about the source of the blood on appellant's jacket, it is difficult to imagine that seeing a bloodied person at a show-up would not have had an impact on Elliot and Lanier, when asked to identify the perpetrator of the vicious stabbing they had just witnessed.